AMERICAN ACADEMY OF PEDIA-
TRICS, National Association of Chil-
dren's Hospitals and Related Institu-
tions, Children's Hospital National
Medical Center, Plaintiffs,

v.

Margaret M. HECKLER, Secretary,
Department of Health and Human
Services, Defendant.

Civ. A. No. 83-0774.

United States District Court,
District of Columbia.

April 14, 1983.

Thomas C. Fox, Stephen E. Lawton, Eliz-
abeth B. Carder, Washington, D.C., for
plaintiffs.

Neil H. Koslowe, Dept. of Justice, Wash-
ington, D.C., for defendant.

## MEMORANDUM

GESELL, District Judge.

This case involves the validity of an inter-
im final regulation published by the defend-

ant Secretary on March 7, 1983, without benefit of public comment, concerning the care and treatment of newborn infants in some 6,400 hospitals receiving federal funds. Plaintiffs contend that the regulation is arbitrary and capricious, that no justification existed for dispensing with public comment as required by the Administrative Procedure Act (APA), that the Secretary lacked statutory authority to act and that the regulation intrudes without justification into family-physician and other confidential relationships protected by the Constitution. A temporary restraining order was denied. These difficult issues are now before the Court after a full hearing on the merits.[1] The following constitute the Court's findings of fact and conclusions of law.

## Background

This case touches upon one of the most difficult and sensitive medical and ethical problems facing our society—the question of what sort of life-sustaining medical treatment, if any, should be utilized to preserve the lives of severely mentally or physically defective newborn infants. Sometimes surgery or other life-sustaining treatment allows an otherwise seriously ill infant to attain complete health and develop normally. Frequently, however, correction of a life-threatening physical defect or use of heroic life-sustaining measures preserves the life of an infant who continues nevertheless to suffer from mental or physical defects so great as seriously to impair the infant's expected quality of life and chances for an independent existence.[2]

Some physicians apply all available life-sustaining techniques in these cases, even where the infant's death due to a severe defect is certain. However, traditionally many attending physicians confronted with a severely defective newborn may, after medical consultation and discussion with family members, agree not to undertake corrective surgery or other life-sustaining measures. The decision to forgo life-preserving measures in these desperate cases is complex and may involve a number of potentially conflicting ethical concerns. In some instances parents and physicians deciding upon a course of medical treatment may, among other factors, consider the risks of treatment; the quality of life the infant will enjoy if it survives; the utility of further life-sustaining measures in the face of a prognosis that certain death will occur in weeks or months; and the impact of a severely mentally or physically defective child upon the parents' marriage, other siblings, and the family's financial resources.

Traditionally, the difficult decision of when to withhold life-sustaining treatment of a defective newborn has been one made within the privacy of the physician-patient relationship, without interference by state or federal authorities. Physicians, after counseling parents on options affecting prognosis and treatment, frequently give great deference to the wishes of the parents who are considered guardians of the best interests of the child. There may be a joint decision that life-sustaining measures

1. The case was presented on documents, depositions and affidavits filed with the Court and has been fully briefed and argued. Defendant has moved to dismiss and plaintiffs request declaratory and injunctive relief. With the agreement of the parties at the expedited hearing on the merits the case will be treated as if before the Court on cross-motions for summary judgment.

2. For example, modern neonatal intensive care procedures can preserve the lives of grossly premature infants who are severely mentally retarded due to oxygen deprivation during birth. Prompt surgical treatment can save children with spina bifida (exposure of the spinal cord) from death but cannot save them from a

life of partial paralysis, moderate to severe mental retardation, and complete dependence upon others for the simplest body functions. Modern techniques can preserve the lives of infants born with little or no brain (anacephalic) or digestive tract for weeks or even months. Surgery can correct the otherwise life-threatening cardiac and intestinal defects that commonly accompany Down's syndrome (mongolism) but cannot alter the mental retardation caused by Down's. See "Deciding to Forego Life-Sustaining Treatment," President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, March, 1983, pp. 181, 197–207.

should be withheld. However, in other situations physicians may proceed contrary to parental instructions and perhaps even seek court intervention on the child's behalf. There is evidence that the medical judgments being reached are not always free of error, particularly in borderline cases and where parental decisions may reflect primarily economic and familial considerations which some find wholly irrelevant.

The problem of serious illness or birth defect in newborn infants is, of course, not a new one. But dramatic advances in neonatal care have made it now possible to sustain some form of life in many infants who decades or even years ago usually died shortly after birth. Moreover, recent publicity surrounding certain cases where parents or physicians have determined not to undertake life-sustaining treatment of defective but possibly salvageable newborns has focused public debate on this delicate and sensitive issue.

Not surprisingly there is heated controversy as to how best to determine the appropriate course of medical care for these infants. These concerns appear to have been sparked by the "Baby Doe" case in Bloomington, Indiana. Baby Doe was born April 9, 1982, afflicted with Down's syndrome (mongolism) and a surgically correctable blockage of his digestive tract which precluded normal feeding. His parents refused to consent to surgery and the hospital turned to the state courts for guidance. Despite appointment of a guardian *ad litem* and several attempts at appeal, no judicial intervention occurred and the infant died six days later.

This case was widely publicized and evoked much public discussion. President Reagan sent a memorandum to the Attorney General and the then-Secretary of Health and Human Services (HHS) dated April 30, 1982, citing the "Baby Doe" case and noting that federal law prohibits discrimination against the handicapped. In response, the Secretary issued a May 18, 1982 "notice" to health care providers "to remind affected parties of the applicability of section 504 of the Rehabilitation Act of 1973." 47 Fed.Reg. 26027 (June 16, 1982). That notice stated that section 504 made it unlawful for hospitals receiving federal financial assistance to withhold nutrition or medical or surgical treatment from handicapped infants if required to correct a life-threatening condition. The notice went on to recognize that recipients of federal financial assistance do not have complete control over treatment, especially where parental wishes are otherwise, but suggested that parental withholding of consent for treatment should not be aided by allowing the infant to remain in the receiving institution, and that failure to comply with section 504 subjected recipients "to possible termination of Federal assistance." *Id.*

Nearly a year later, on March 7, 1983, a newly-appointed Secretary published the regulation at issue in this case. 48 Fed. Reg. 9630.

### The Challenged Regulation

The regulation issued by the Secretary is novel and far-reaching. It has provoked strong responses, both favorable and unfavorable, from those sections of the community concerned with the medical care of newborn infants or the civil rights of the handicapped.[3] Like the notice of May 18, the regulation was also promulgated under section 504 of the Rehabilitation Act of 1973, which provides that

> [n]o otherwise qualified handicapped individual in the United States ... shall, solely by reason of his handicap, be excluded from the participation in, be de-

**3.** The following have filed briefs as *amici curiae* supporting plaintiffs or defendant:

Association for Retarded Citizens
American Coalition of Citizens with Disabilities
Down's Syndrome Congress
People First of Nebraska
Spina-Bifida Association of America
The Association for the Severely Handicapped

American Hospital Association
David G. McLone
Margaret Mahon
Lawrence J. Brodeur (guardian *ad litem* for Baby Doe)
Society of Critical Care Medicine
Disability Rights Education and Defense Fund
American Medical Association

nied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.... 29 U.S.C. § 794.

Invoking this authority, the Secretary for the first time undertook actively to oversee the medical treatment of severely defective newborn infants and to safeguard their lives, acting as what counsel for defendant characterized "the protector of last resort."

The "interim final rule" became effective March 22, 1983. It requires hospitals and other medical institutions receiving federal financial assistance to post permanently "in a conspicuous place in each delivery ward, each maternity ward, each pediatric ward, and each nursery, including each intensive care nursery," the following sign:

> DISCRIMINATORY FAILURE TO FEED AND CARE FOR HANDICAPPED INFANTS IN THIS FACILITY IS PROHIBITED BY FEDERAL LAW
>
> Section 504 of the Rehabilitation Act of 1973 states that "no otherwise qualified handicapped individual shall, solely by reason of handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance."
>
> *Any person having knowledge that a handicapped infant is being discriminatorily denied food or customary medical care should immediately contact:*
>
> Handicapped Infant Hotline
> U.S. Department of Health and Human Services
> Washington, D.C. 20201
> Phone 800–368–1019 (available 24 hours a day)
> In the City of Washington, D.C.—863–0100 (TTY capability)
> or
> Your State Child Protective Agency [address and telephone number]
>
> Federal law prohibits retaliation or intimidation against any person who provides information about possible violations of the Rehabilitation Act of 1973.

> Identity of callers will be held confidential.
>
> Failure to feed and care for infants may also violate the criminal and civil laws of your State.

Under the regulation a possible violation reported anonymously or otherwise via the "hotline" may be referred by the agency in turn to state child protective authorities or to the Department of Justice for civil rights enforcement. The regulation also authorizes immediate intervention by an HHS Office of Civil Rights investigation squad to protect the life or health of a handicapped infant. Institutions receiving federal financial assistance are required to give 24-hour access to hospital records and facilities during the investigation, and physicians, families and hospital staff are subject to immediate on-the-scene questioning while in the midst of providing newborn care and treatment.

### The Regulation Fails To Satisfy The Requirements of the Administrative Procedure Act

The Administrative Procedure Act, 5 U.S.C. § 551, *et seq.,* was designed to curb bureaucratic actions taken without consultation and notice to persons affected. Broad delegations of rulemaking authority from the Congress were intended to be tempered by assuring a degree of due process for those to be governed by the rule. *United States v. Morton Salt Co.,* 338 U.S. 632, 644, 70 S.Ct. 357, 364, 94 L.Ed. 401 (1950). The greater the impact of the regulation upon established practices or the greater the number of people directly affected, the more the courts have insisted that the right of comment by those affected be preserved. *American Federation of Government Employees v. Block,* 655 F.2d 1153, 1156 (D.C. Cir.1981). Thus the Act has been generally construed to curtail rulemaking without comment. Moreover, the Act requires that all regulations shall issue only after the rulemaker has considered relevant factors to prevent arbitrary and capricious decision-making and to assure rational consideration

of the impact of the contemplated regulatory action. The instant regulation offends these established precepts to a remarkable extent.

When the Secretary issued the regulation, she had before her a videotape of an evocative series of investigative television broadcasts, entitled "Death In the Nursery," reviewing past publicized cases where medical treatment had been withheld from defective infants,[4] as well as a series of newspaper accounts of the same and similar events and a MacNeil-Lehrer broadcast. Also available were articles in medical and academic journals, some surveys showing disparate medical practices, and reports of investigations undertaken by the HHS Office of Civil Rights since the Baby Doe case which had failed to reveal any impropriety. In addition, Dr. C. Everett Koop, the Surgeon General and a distinguished pediatrician, gave the Secretary oral advice supporting the need for some sort of regulatory control in this area although he was not consulted as to this specific regulation.

██ Thus ground may have existed for undertaking a regulatory approach to the problem of how newborns should be treated in government-financed hospitals, if implementing authority could be found. Nevertheless, after full consideration of the entire record the Court finds that the interim final rule of March 7, 1983, is invalid as an arbitrary and capricious agency action which fails to meet the standard required under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).

The Court is well aware that agency rulemaking must be considered deferentially and that this Court is prohibited from substituting its own judgment for that of the agency if a rational basis exists for the agency's decision. Nevertheless, this Court may not, on the other hand, "rubber-stamp"

challenged agency decisions and must inquire whether the agency's action was based on a consideration of the relevant factors. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *Wawszkiewicz v. Department of the Treasury,* 670 F.2d 296, 301–304 (D.C.Cir.1981). Lacking such consideration the regulation fails to satisfy the test of rationality and cannot be sustained because it is arbitrary and capricious.

The record tendered in support of the Secretary's action here clearly establishes that many highly relevant factors central to any application of section 504 to medical care of newborn infants were not considered prior to promulgation of the challenged rule.

All matters considered by the Secretary are documented in Court Exhibit A. However, that record reflects no consideration whatsoever of the disruptive effects of a 24-hour, toll-free "hotline" upon ongoing treatment of newborns. As indicated, any anonymous tipster, for whatever personal motive, can trigger an investigation involving immediate inspection of hospital records and facilities and interviewing of involved families and medical personnel. In a desperate situation where medical decisions must be made on short notice by physicians, hospital personnel and often distraught parents, the sudden descent of "Baby Doe" squads on the scene, monopolizing physician and nurse time and making hospital charts and records unavailable during treatment, can hardly be presumed to produce higher quality care for the infant.[5]

Nor are the interests of the child served by a regulation that contemplates forced removal of the child from a hospital if a parent refuses to allow medical care or the termination of any federal assistance to the hospital as a whole, as suggested by the May 18 notice. No weighing of these fac-

---

4. Channel 7 News in Boston aired the three-part expose. This film was relied on by the Secretary and has been viewed by the Court. It sensationalizes the issues underlying the regulation, relying in substantial part on events and studies already publicized, some going back several years.

5. Dr. Parrott of Children's Hospital National Medical Center, which the Secretary considers an example of the standard of care desired, detailed by affidavit the serious consequences of such intrusion coupled with the suggestive nature of the posted signs.

tors is indicated in the record nor has any attempt been made to balance them against the malpractice and disciplinary risks that may be imposed upon physicians and hospitals caught between the requirements of the regulation and established legal and ethical guidelines.

It is clear that a primary purpose of the regulation is to require physicians treating newborns to take into account only wholly medical risk-benefit considerations and to prevent parents from having any influence upon decisions as to whether further medical treatment is desirable. The Secretary did not appear to give the slightest consideration to the advantages and disadvantages of relying on the wishes of the parents who, knowing the setting in which the child may be raised, in many ways are in the best position to evaluate the infant's best interests. Ignoring parental preferences again may increase the risk that parents will withdraw the infant from hospital care entirely, and the long-term interests of physically disabled newborns may be affected by thrusting the child into situations where economic, emotional and marital effects on the family as a whole are so adverse that the effort to preserve an unwanted child may require concurrent attention to procedures for adoption or other placement.

None of these sensitive considerations touching so intimately on the quality of the infant's expected life.were even tentatively noted. No attempt was made to address the issue of whether termination of painful, intrusive medical treatment might be appropriate where an infant's clear prognosis is death within days or months or to specify the level of appropriate care in such futile cases. Means of funding the extensive care mandated by the regulation and for allocating scarce medical resources between defective newborns and other newborns or other patients were also apparently not considered.

There can be no dispute as to the relevance of these issues under section 504 as the Secretary proposes.it be applied. They are acknowledged and elaborated by informed briefs of amici and qualified experts on behalf of one or both parties.

Not only are these relevant factors not considered but there are other matters lacking in the rulemaking record. It contains no indication that the legal and constitutional considerations which should have guided the Secretary in her decisional process were reviewed. Neither the requirements of the Administrative Procedure Act nor questions as to the scope of section 504 were apparently noted. No alternative means of protecting handicapped infants were reviewed or considered although the Secretary was aware of the imminent release of the landmark report of the President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavorial Research, which counsels different approaches to the issue. Indeed, the record even fails to suggest a widespread denial of proper newborn care such as would justify the type of regulation selected.

As finder of fact, this Court is forced to conclude that haste and inexperience have resulted in agency action based on inadequate consideration. This is reinforced by the text of the rule itself. For example, the rule provides that it is a violation of federal law to deny a handicapped infant "customary medical care." Yet as all the evidence received by this Court from both parties has made clear, and as even the most cursory investigation by the Secretary would have revealed, *there is no customary standard of care* for the treatment of severely defective infants. The regulation thus purports to set up an enforcement mechanism without defining the violation, and is virtually without meaning beyond its intrinsic *in terrorem* effect.

■ Even if the regulation could withstand the requirements of 5 U.S.C. § 706(2)(A), it must be declared invalid due to the Secretary's failure to follow procedural requirements in its promulgation. It is undisputed that the rule was not issued in accordance with either the public notice or 30-day delay-of-effective date requirements of the APA. 5 U.S.C. § 553(b) and (d).

The Secretary argues that the rule is either a "procedural" or "interpretative" rule not subject to the requirements of these provisions, or that waiver of these requirements is appropriate given the need "to protect life from imminent harm." Neither of these arguments has merit.

As defendant's counsel acknowledged in argument, the regulation is intended, among other things, to change the course of medical decisionmaking in these cases by eliminating the parents' right to refuse to consent to life-sustaining treatment of their defective newborn.[6] Moreover, the regulation provides for an intrusive on-premises enforcement mechanism that can be triggered by a simple anonymous call. Thus it clearly is more than a "clarification or explanation of an existing rule or statute" and affects substantive rights. *Guardian Federal Savings and Loan Association v. FSLIC,* 589 F.2d 658, 664 (D.C.Cir.1978).

Nor has the Secretary demonstrated good cause why APA notice procedures should be waived. The "good cause" exceptions to sections 553(b) and (d) should be narrowly construed and only reluctantly countenanced, *New Jersey v. Environmental Protection Agency,* 626 F.2d 1038, 1045 (D.C. Cir.1980). As already noted, this is particularly the case where the issues affect the general public and involve complex and controversial questions of ethics and public policy, as in this case. The Secretary argues that waiver is appropriate because "[a]ny delay would leave lives at risk." 48 Fed. Reg. 9631. Such an argument could as easily be used to justify immediate implementation of any sort of health or safety regulation, no matter how small the risk for the population at large or how long-standing the problem. There is no indication in this case of any dramatic change in circumstances that would constitute an emergency justifying shunting off public participation in the rulemaking.[7] *American Federation, supra,* at 1156.

### The Application of Section 504

Because the Court finds the regulation to be invalid as arbitrary and capricious and promulgated outside the procedural requirements of the APA, it is not necessary for this Court to determine whether the regulation exceeds authority granted the Secretary under section 504. However, some concerns on this issue should be noted.

At the Court's request the parties have extensively briefed the meaning and effect of section 504 and the Court has undertaken independent research. The legislative history of the section focuses on discrimination against adults and older children and denial of access to federal programs. As far as can be determined, no congressional committee or member of the House or Senate ever even suggested that section 504 would be used to monitor medical treatment of defective newborn infants or establish standards for preserving a particular quality of life. No medical group appeared alert to the intrusion into medical practice which some doctors apprehend from such an undertaking, nor were representatives of parents or spokesmen for religious beliefs that would be affected heard. Moreover, until the April, 1982, communication from President Reagan the record does not reflect any official indication that the section was subject to this interpretation during the many years it had by then already been in effect.

On the other hand, the statute on its face is open to a broad and all-inclusive interpretation. Section 504 requires that no recipient of federal financial assistance discriminate against handicapped individuals. A

---

6. As Mr. Koslowe, counsel for defendant, stated at oral argument, the regulation is intended to produce "a change in how the doctors will reach their final judgments as to what to do or not to do in a given case, not their medical judgments, but whether they will stick to those medical judgments or allow those medical judgments to be overridden by parental objections." Excerpt from hearing, April 8, 1983, p. 15.

7. The Secretary has failed to suggest, and the evidence before her did not support, any assertion that there has been a change in circumstances so that more lives are at risk presently than in the recent past or that the problem has somehow only for the first time become observable. Much of the information relied on by the Secretary was several years old.

handicapped individual is defined in 29 U.S.C. § 706 as "any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." While the term "infant" in the regulation is not defined, at least some infants born with physical and mental defects may well fit within that broad definition.

Consequently whether the coverage of the regulation falls within or outside the authority of section 504 may well depend upon the manner in which section 504 is actually applied. Given the language of the statute and its similarity to other civil rights statutes which have been broadly read, it cannot be said that section 504 does not authorize some regulation of the provision of some types of medical care to handicapped newborns. At one extreme, it is reasonable to suggest that section 504 prohibits denial of the most basic services, such as access to medical care, hospital facilities or food, to a mildly handicapped child whose parents want him to benefit from those services. But defendants and *amici* in support of defendants read the regulation and thus the statute far more broadly. It has been suggested by *amici* that the rule requires doctors and parents to undertake heroic measures to preserve for as long as possible, despite expense and a prognosis of certain death within months, the life of an anacephalic infant lacking all or part of the brain and with no hope of ever achieving even the most rudimentary form of consciousness.

Many would argue that had Congress intended section 504 to reach so far into such a sensitive area of moral and ethical concerns it would have given some evidence of that intent. Hopefully this will be clarified by further congressional action. In any event, cases such as *Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), and *American Public Transit Association v. Lewis,* 655 F.2d 1272 (D.C.Cir.1981), suggest that section 504 was never intended by Congress to

be applied blindly and without any consideration of the burdens and intrusions that might result. Yet the question of when, or whether, section 504 authorizes federal intervention in decisions regarding the treatment of handicapped newborns is a question which should await the actual application of the statute to a set of particular circumstances. The instant case involves no parent or child plaintiff and no application of the rule to a specific case. It therefore is not an appropriate vehicle to consider the ramifications and scope of section 504. *Toilet Goods Association v. Gardner,* 387 U.S. 158, 163–166, 87 S.Ct. 1520, 1524–1525, 18 L.Ed.2d 697 (1967).

## *Constitutional Considerations*

Finally, plaintiffs and *amici* have advanced two general constitutional challenges to the statute. Much for the same reason that this Court has not determined the scope of section 504's authority, it declines to reach these constitutional issues.

It is argued that the rule is impermissibly vague and overbroad. Given that neither "customary care," "infant," nor "discrimination due to handicap" are defined, there is some merit to the view that a physician attending a severely defective newborn may well be unable to determine what type of conduct the rule purports to require or prohibit. However, a broad regulation may be given content through its proper application, *Waters v. Peterson,* 495 F.2d 91, 99–100 (D.C.Cir.1973), and review on this basis should await the actual application of the regulation to particular conduct. *United States v. National Dairy Products Corp.,* 372 U.S. 29, 31–33, 83 S.Ct. 594, 597, 9 L.Ed.2d 561 (1963).

Second, plaintiffs have suggested summarily that the regulation, by not supplying adequate procedural safeguards to any investigation resulting from a "hotline" complaint, is in conflict with an amorphous group of constitutional interests. These are described varingly throughout the papers as due process, right to privacy in the patient-physician relationship and the right to confidentiality of medical records. *See Whalen*

*v. Roe,* 429 U.S. 589, 599–604, 97 S.Ct. 869, 876–878, 51 L.Ed.2d 64 (1977). The exact nature of the rights plaintiffs seek to assert are uncertain as are the procedural safeguards alleged to be lacking. Again, in the absence of actual application of the regulation and a concrete set of facts this Court declines to hold in the abstract that the regulation violates such constitutional rights on its face. The Court notes, however, that to the extent the regulation is read to eliminate the role of the infant's parents in choosing an appropriate course of medical treatment, its application may in some cases infringe upon the interests outlined in cases such as *Carey v. Population Services International,* 431 U.S. 678, 684–685, 97 S.Ct. 2010, 2015–2016, 52 L.Ed.2d 675 (1977); *Roe v. Wade,* 410 U.S. 113, 152–153, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973); and *Griswold v. Connecticut,* 381 U.S. 479, 484, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965). However, no party is before the Court at present claiming such a constitutional interest and the issue cannot be joined in this case.[8]

### Conclusion

This regulation cannot be sustained. It is arbitrary and capricious. There may well be defects in medical procedures and hospital policies governing treatment of seriously disabled newborns in some hospitals. More fundamentally, the rising public debate over the role of physicians and family members in these difficult and sensitive situations where life may hang in the balance has raised issues which must eventually be faced at either the local or national level. The solution does not, however, lie in a hasty, ill-considered "hotline" informer rule. Government intervention into the difficult medical and human decisions that must be made in the delivery rooms and newborn intensive care units of our hospitals involves a profound change in the manner in which these decisions affecting the quality of life are made. Any intervention by an agency of the Federal Government should obviously reflect caution and sensitivity, given the present absence of a clear congressional directive. At the minimum, wide public comment prior to rulemaking is essential. Only by preserving this democratic process can good intentions be tempered by wisdom and experience.

An appropriate Order invalidating the interim final regulation is filed herewith.

### ORDER AND DECLARATION

For reasons fully stated in the Court's Memorandum filed herewith, it is this 14 day of April, 1983,

---

**8.** In addition to the principal issues discussed above, the parties raised a number of minor points which the Court finds either entirely lacked merit or are not appropriately before the Court for determination at this stage.

Plaintiffs argue that the regulation by authorizing some federal supervision of the medical treatment of newborns violates 42 U.S.C. § 1395, a section of the Medicare Act. That section on its face does not bar Congress from implementing controls over the practice of medicine under another statute.

Plaintiffs suggest that the regulation violates section 504 itself, because that section includes a requirement that certain regulations be presented to Congress 30 days before their effective date. Because the Court finds the March 7 regulation was promulgated in violation of applicable APA procedures, it is not necessary to reach this issue. Nor is it necessary, in the absence of some actual application of the regulation to a particular hospital, to determine as certain *amici* have argued whether various federal programs such as Medicare, Medicaid, and the Hill-Burton Act should be considered "federal financial assistance."

Finally, in an Amended Complaint filed two days before the scheduled final hearing on the merits, plaintiffs for the first time in this case requested this Court to review the May 18, 1982, notice as well as the March 7, 1983, regulation. While defendants have not had opportunity to respond to this new issue, no basis was presented for finding the notice invalid on its face. Plaintiffs do not allege the notice violated the APA but simply argue that, like the March 18 regulation, the notice is outside the scope of the authority granted the Secretary under section 504, violates the Medicare Act, and infringes upon constitutional rights in physician-patient privacy and confidentiality. As noted, the notice is not a violation of the Medicare Act and given its uncertain meaning and scope any review of its validity under section 504 and the Constitution must await its actual application to a particular set of facts. These issues should not be determined in the abstract.

ORDERED that defendant's motion to dismiss the complaint and amended complaint is denied; and it is further

DECLARED that defendant's March 7, 1983, interim final rule, 48 Fed.Reg. 9630, is arbitrary and capricious and promulgated in violation of the Administrative Procedure Act, and it is further

ORDERED that defendant shall promptly place a notice in the *Federal Register* advising that said interim final rule has been declared invalid and has no further force or effect, and it is further

ORDERED that applications for attorneys' fees and/or costs may be filed within 30 days of the time that this Order and Declaration becomes final.