# BOWEN, SECRETARY OF HEALTH AND HUMAN SERVICES *v.* AMERICAN HOSPITAL ASSOCIATION ET AL.

No. 84–1529.   Argued January 15, 1986—Decided June 9, 1986

STEVENS, J., announced the judgment of the Court, and delivered an opinion in which MARSHALL, BLACKMUN, and POWELL, JJ., joined. BURGER, C. J., concurred in the judgment. WHITE, J., filed a dissenting opinion, in which BRENNAN, J., joined and in Parts I, II, IV, and V of which O'CONNOR, J., joined, *post*, p. 648. O'CONNOR, J., filed a dissenting opinion, *post*, p. 665. REHNQUIST, J., took no part in the consideration or decision of the case.

*Deputy Assistant Attorney General Cooper* argued the cause for petitioner. With him on the briefs were *Solicitor General Fried, Assistant Attorney General Reynolds, Dep-*

uty Solicitor General Wallace, Edwin S. Kneedler, Brian K. Landsberg, and Mark L. Gross.

Richard L. Epstein argued the cause for respondents American Hospital Association et al. With him on the brief were Stuart M. Gerson, William G. Kopit, David H. Larry, and Robert W. McCann. Benjamin W. Heineman, Jr., argued the cause for respondents American Medical Association et al. With him on the brief were Carter G. Phillips, Vincent F. Prada, Newton N. Minow, Jack R. Bierig, Ann E. Allen, and Joseph A. Keyes, Jr.*

JUSTICE STEVENS announced the judgment of the Court and delivered an opinion, in which JUSTICE MARSHALL, JUSTICE BLACKMUN, and JUSTICE POWELL join.

This case presents the question whether certain regulations governing the provision of health care to handicapped infants are authorized by § 504 of the Rehabilitation Act of 1973. That section provides, in part:

---

*Briefs of amici curiae urging reversal were filed for the American Association on Mental Deficiency et al. by James W. Ellis and Ruth A. Luckasson; for the American Coalition of Citizens with Disabilities et al. by Thomas K. Gilhool, Frank J. Laski, Michael Churchill, and Timothy M. Cook; for the Associaion for Retarded Citizens of the United States et al. by Martin H. Gerry; for the Disability Rights Education & Defense Fund, Inc., et al. by Barbara M. Milstein; for the Rutherford Institute et al. by W. Charles Bundren, Guy O. Farley, Jr., James J. Knicely, John W. Whitehead, Thomas O. Kotouc, Wendell R. Bird, and William B. Hollberg; for Carlton Johnson by James Bopp, Jr., and Thomas J. Marzen; and for David G. McLone, M. D., et al. by Dennis J. Horan, Victor G. Rosenblum, Edward R. Grant, and Maura K. Quinlan.

Briefs of amici curiae urging affirmance were filed for the American Academy of Pediatrics et al. by Stephan E. Lawton, Jack N. Goodman, and John A. Hodges; for the State University of New York by Robert Abrams, Attorney General of New York, Robert Hermann, Solicitor General, Frederick K. Mehlman, Stanley A. Camhi, Paul M. Glickman, Donna Miller, Martha O. Shoemaker, and Jane Levine, Assistant Attorneys General, and Sanford H. Levine; and for George P. Smith II, pro se.

James Bopp, Jr., filed a brief for Senator Orrin G. Hatch et al. as amici curiae.

"No otherwise qualified handicapped individual . . . shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 87 Stat. 394, 29 U. S. C. § 794.[1]

I

The American Medical Association, the American Hospital Association, and several other respondents[2] challenge the validity of Final Rules promulgated on January 12, 1984, by the Secretary of the Department of Health and Human Services.[3] These Rules establish "Procedures relating to health care for handicapped infants," and in particular require the posting of informational notices, authorize expedited access to records and expedited compliance actions, and command state child protective services agencies to "prevent instances of unlawful medical neglect of handicapped infants." 45 CFR § 84.55 (1985).

Although the Final Rules comprise six parts, only the four mandatory components are challenged here.[4] Subsection (b)

---

[1] "Handicapped individual" is defined in § 7(7)(B) of the Act, as amended, as "any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." 92 Stat. 2985, 29 U. S. C. § 706(7)(B).

[2] Respondents include the Hospital Association of New York State, the American College of Obstetricians and Gynecologists, the Association of American Medical Colleges, the American Academy of Family Physicians, and certain individual physicians.

[3] Margaret Heckler occupied the position of Secretary throughout the rulemaking period. On December 13, 1985, after certiorari had been granted, Dr. Otis Bowen assumed that position. Despite the fact that Dr. Bowen was not responsible for promulgation of the Final Rules, for the sake of continuity our references assume that he was. For ease of reference we refer to the Secretary, the Department, and HHS interchangeably.

[4] In subsection (a) the Department "encourages each recipient health care provider that provides health care services to infants" to establish an

is entitled "Posting of informational notice" and requires every "recipient health care provider that provides health care services to infants in programs or activities receiving

"Infant Care Review Committee (ICRC)" to assist in the development of treatment standards for handicapped infants and to provide assistance in making individual treatment decisions. 45 CFR § 84.55(a) (1985). In subsection (f), the Department describes its version of a model ICRC.

Subsection (f) also provides that "[t]he activities of the ICRC will be guided by . . . [t]he interpretative guidelines of the Department." 45 CFR § 84.55(f)(1)(ii)(A) (1985). These guidelines, which are "illustrative" and "do not independently establish rules of conduct," pt. 84, Appendix C, ¶ (a), set forth the Department's interpretation of § 504. Although they do not contain any definition of "discrimination," they do state that § 504 is not applicable to parents and that the regulation applies to only two categories of activities of hospitals: (1) refusals to provide treatment or nourishment to handicapped infants whose parents have consented to, or requested, such treatment; and (2) the failure or refusal to take action to override a parental decision to withhold consent for medically beneficial treatment or nourishment. With respect to the second category, the guidelines state that the hospital may not "solely on the basis of the infant's present or anticipated future mental or physical impairments, fail to follow applicable procedures on reporting such incidents to the child protective services agency or to seek judicial review." 45 CFR pt. 84, Appendix C, ¶ (a)(4) (1985).

With respect to the first category, the guidelines do not state that § 504 categorically prohibits a hospital from withholding requested treatment or nourishment "solely on the basis of present or anticipated physical or mental impairments of an infant." 45 CFR pt. 84, Appendix C, ¶ (a)(1). Rather, the substantive guidelines and two of the illustrative examples recognize that the etiology of and prognosis for particular handicapping conditions may justify "a refusal to treat solely on the basis of those handicapping conditions." ¶ (a)(2) (§ 504 does not require "futile treatment"); ¶ (a)(5)(iii) (§ 504 does not require treatment of anencephaly because it would "do no more than temporarily prolong the act of dying"); ¶ (a)(iv) (same with severely premature and low birth weight infants). In general, the guidelines seem to make a hospital's liability under § 504 dependent on proof that (1) it refused to provide requested treatment or nourishment solely on the basis of an infant's handicapping condition, and (2) the treatment or nourishment would have been medically beneficial. See ¶¶ (a)(1)–(2), (5).

The guidelines also describe how HHS will respond to "complaints of suspected life threatening noncompliance" with § 504 in this context, progress-

Federal financial assistance"—a group to which we refer generically as "hospitals"—to post an informational notice in one of two approved forms. 45 CFR § 84.55(b) (1985). Both forms include a statement that § 504 prohibits discrimination on the basis of handicap, and indicate that because of this prohibition "nourishment and medically beneficial treatment (as determined with respect for reasonable medical judgments) should not be withheld from handicapped infants solely on the basis of their present or anticipated mental or physical impairments." 45 CFR §§ 84.55(b)(3), (4) (1985). The notice's statement of the legal requirement does not distinguish between medical care for which parental consent has been obtained and that for which it has not. The notice must identify the telephone number of the appropriate child protective services agency and, in addition, a toll-free number for the Department that is available 24 hours a day. *Ibid.* Finally, the notice must state that the "identity of callers will be kept confidential" and that federal law prohibits retaliation "against any person who provides information about possible violations." *Ibid.*

Subsection (c), which contains the second mandatory requirement, sets forth "Responsibilities of recipient state child protective services agencies." Subsection (c) does not mention § 504 (or any other federal statute) and does not even use the word "discriminate." It requires every designated agency to establish and maintain procedures to ensure that

---

ing from telephone inquiries to the hospital to obtain information about the condition of the infant, to requests for access to records, and finally to on-site investigations and litigation in appropriate cases. ¶ (b). The guidelines do not draw any distinction between cases in which parental consent has been withheld and those in which it has been given. Nor do they draw any distinction between cases in which hospitals have made a report of parental refusal to consent to treatment and those in which no report to a state agency has been made. They do announce that the "Department will also seek to coordinate its investigation with any related investigations by the state child protective services agency so as to minimize potential disruption," ¶ (b)(4), indicating that the Department's investigations may continue even in cases that have previously been referred to a state agency.

"the agency utilizes its full authority pursuant to state law to prevent instances of unlawful medical neglect of handicapped infants." 45 CFR § 84.55(c)(1). Mandated procedures must include (1) "[a] requirement that health care providers report on a timely basis . . . known or suspected instances of unlawful medical neglect of handicapped infants," § 84.55(c)(1)(i); (2) a method by which the state agency can receive timely reports of such cases, § 84.55(c)(1)(ii); (3) "immediate" review of those reports, including "on-site investigation," where appropriate, § 84.55(c)(1)(iii); (4) protection of "medically neglected handicapped infants" including, where appropriate, legal action to secure "timely court order[s] to compel the provision of necessary nourishment and medical treatment," § 84.55(c)(1)(iv); and (5) "[t]imely notification" to HHS of every report of "suspected unlawful medical neglect" of handicapped infants. The preamble to the Final Rules makes clear that this subsection applies "where a refusal to provide medically beneficial treatment is a result, not of decisions by a health care provider, but of decisions by parents." 49 Fed. Reg. 1627 (1984).

The two remaining mandatory regulations authorize "[e]xpedited access to records" and "[e]xpedited action to effect compliance." 45 CFR §§ 84.55(d), (e) (1985). Subsection (d) provides broadly for immediate access to patient records on a 24-hour basis, with or without parental consent, "when, in the judgment of the responsible Department official, immediate access is necessary to protect the life or health of a handicapped individual." § 84.55(d). Subsection (e) likewise dispenses with otherwise applicable requirements of notice to the hospital "when, in the judgment of the responsible Department official, immediate action to effect compliance is necessary to protect the life or health of a handicapped individual." § 84.55(e). The expedited compliance provision is intended to allow "the government [to] see[k] a temporary restraining order to sustain the life of a handicapped infant in

imminent danger of death." 49 Fed. Reg. 1628 (1984). Like the provision affording expedited access to records, it applies without regard to whether parental consent to treatment has been withheld or whether the matter has already been referred to a state child protective services agency.

## II

The Final Rules represent the Secretary's ultimate response to an April 9, 1982, incident in which the parents of a Bloomington, Indiana, infant with Down's syndrome and other handicaps refused consent to surgery to remove an esophageal obstruction that prevented oral feeding. On April 10, the hospital initiated judicial proceedings to override the parents' decision, but an Indiana trial court, after holding a hearing the same evening, denied the requested relief. On April 12 the court asked the local Child Protection Committee to review its decision. After conducting its own hearing, the Committee found no reason to disagree with the court's ruling.[5] The infant died six days after its birth.

Citing "heightened public concern" in the aftermath of the Bloomington Baby Doe incident, on May 18, 1982, the director of the Department's Office of Civil Rights, in response to a directive from the President, "remind[ed]" health care providers receiving federal financial assistance that newborn in-

---

[5] At the instance of the local prosecutor, the Indiana courts on April 13 held another hearing at which the court concluded that "Baby Doe" had not been neglected under Indiana's Child in Need of Services statute. Additional attempts to seek judicial intervention were rebuffed the same day. On the following day, the Indiana Court of Appeals denied a request for an immediate hearing. *In re Infant Doe*, No. GU 8204–004A (Monroe County Cir. Ct., Apr. 12, 1982). The Indiana Supreme Court, by a vote of 3 to 1, rejected a petition for a writ of mandamus. *State ex rel. Infant Doe* v. *Baker*, No. 482 S 140 (May 27, 1982). The infant died while a stay was being sought in this Court, and we subsequently denied certiorari. *Infant Doe* v. *Bloomington Hospital*, 464 U. S. 961 (1983).

fants with handicaps such as Down's syndrome were protected by § 504. 47 Fed. Reg. 26027 (1982).[6]

This notice was followed, on March 7, 1983, by an "Interim Final Rule" contemplating a "vigorous federal role." 48 Fed. Reg. 9630. The Interim Rule required health care providers receiving federal financial assistance to post "in a conspicuous place in each delivery ward, each maternity ward, each pediatric ward, and each nursery, including each intensive care nursery" a notice advising of the applicability of § 504 and the availability of a telephone "hotline" to report suspected violations of the law to HHS. *Id.*, at 9631. Like the Final Rules, the Interim Rule also provided for expedited compliance actions and expedited access to records and facilities when, "in the judgment of the responsible Department official," immediate action or access was "necessary to protect the life or health of a handicapped individual." *Id.*, at 9632. The Interim Rule took effect on March 22.

On April 6, 1983, respondents American Hospital Association et al. filed a complaint in the Federal District Court for the Southern District of New York seeking a declaration that the Interim Final Rule was invalid and an injunction against its enforcement. Little more than a week later, on April 14, in a similar challenge brought by the American Academy of Pediatrics and other medical institutions, the Federal District Court for the District of Columbia declared the Interim Final Rule "arbitrary and capricious and promulgated in violation of the Administrative Procedure Act." *American Academy of Pediatrics* v. *Heckler,* 561 F. Supp. 395, 404 (1983). The District Judge in that case "conclude[d] that haste and inexperience ha[d] resulted in agency action based on inadequate consideration" of several relevant concerns

---

[6] The notice maintained that hospitals would violate § 504 if they "allow[ed] [an] infant" to remain in their care after "the infant's parents or guardian [had withheld consent to] treatment or nourishment discriminatorily." 47 Fed. Reg. 26027 (1982). The Secretary no longer subscribes to this reading of the statute. See 49 Fed. Reg. 1631 (1984).

and, in the alternative, found that the Secretary had improperly failed to solicit public comment before issuing the Rule. *Id.*, at 399–401.

On July 5, 1983, the Department issued new "Proposed Rules" on which it invited comment. Like the Interim Final Rule, the Proposed Rules required hospitals to post informational notices in conspicuous places and authorized expedited access to records to be followed, if necessary, by expedited compliance action. 48 Fed. Reg. 30851. In a departure from the Interim Final Rule, however, the Proposed Rules required federally assisted state child protective services agencies to utilize their "full authority pursuant to State law to prevent instances of medical neglect of handicapped infants." *Ibid.* Mandated procedures mirrored those contained in the Final Rules described above. *Ibid.* The preamble and appendix to the Proposed Rules did not acknowledge that hospitals and physicians lack authority to perform treatment to which parents have not given their consent.[7]

---

[7] In explaining the need for the Proposed Rules, the preamble, although mentioning "parental rights over their children," insisted that physicians' "acquiescence in nontreatment of Down's children is apparently *because of* the handicap," rather than, it must be supposed, lack of parental consent. 48 Fed. Reg. 30848 (1983).

The effect of parental nonconsent was not even mentioned in the appendix to the Proposed Rules. That section, which set forth the Department's view of "the manner in which Section 504 applies to the provision of health care services to handicapped infants," *id.*, at 30851, declared that § 504 mandated "the basic provision of nourishment, fluids, and routine nursing care." *Id.*, at 30852. The provision of sustenance, according to the Department, was "not an option for medical judgment." *Ibid.* Thus, "[e]ven if a handicapped infant faces imminent and unavoidable death, no health care provider should take upon itself to cause death by starvation or dehydration." *Ibid.*

In addition to its unqualified endorsement of nourishment as required by § 504, the appendix announced that "[a]ny decision not to correct intestinal atresia in a Down's Syndrome child, unless an additional complication medically warrants such decision, *must* be deemed a denial of services based on

After the period for notice and comment had passed, HHS, on December 30, 1983, promulgated the Final Rules and announced that they would take effect on February 13, 1984. On March 12 of that year respondents American Hospital Association et al. amended their complaint and respondents American Medical Association et al. filed suit to declare the new regulations invalid and to enjoin their enforcement. The actions were consolidated in the Federal District Court for the Southern District of New York, which awarded the requested relief on the authority of the decision of the United States Court of Appeals for the Second Circuit in *United States* v. *University Hospital*, 729 F. 2d 144 (1984). *American Hospital Assn.* v. *Heckler*, 585 F. Supp. 541 (1984); App. to Pet. for Cert. 50a. On appeal, the parties agreed that the reasoning of the Court of Appeals in *University Hospital*, if valid, required a judgment against the Government in this case.[8] In accordance with its earlier decision, the Court of Appeals summarily affirmed the District Court. 694 F. 2d 676 (1984). Since the judgment here thus rests entirely on the reasoning of *University Hospital*, it is appropriate to examine that case now.

## III

On October 11, 1983, after the Department's Interim Final Rule had been declared invalid but before it had promulgated the Final Rules challenged here, a child with multiple congenital defects known as "Baby Jane Doe" was born in Long

---

the handicap of Down's Syndrome. The same reasoning applies to a case of Down's Syndrome [infant] with esophogeal atresia, and the denial of surgery to correct atresia." *Ibid.* (emphasis added). The Department did not discuss the relevance of parental nonconsent to the hospital's treatment obligation under § 504, presumably because it was irrelevant given its understanding of the provision at that time.

[8] Indeed, although the Government took an appeal from the District Court's judgment, it filed a motion for summary disposition after the Court of Appeals denied its motion for initial consideration en banc. Its motion expressly acknowledged that an affirmance was compelled by the decision in *University Hospital*.

Island, New York, and was promptly transferred to University Hospital for corrective surgery. After consulting with physicians and other advisers, the parents decided to forgo corrective surgery that was likely to prolong the child's life, but would not improve many of her handicapping conditions.

On October 16, 1983, an unrelated attorney named Washburn filed suit in the New York Supreme Court, seeking the appointment of a guardian *ad litem* for the infant who would direct the hospital to perform the corrective surgery. The trial court granted that relief on October 20, but was reversed the following day by the Appellate Division which found that the "concededly concerned and loving parents" had "chosen one course of appropriate medical treatment over another" and made an informed decision that was "in the best interest of the infant." *Weber* v. *Stony Brook Hospital,* 95 App. Div. 2d 587, 589, 467 N. Y. S. 2d 685, 687 *(per curiam).* On October 28, the New York Court of Appeals affirmed, but on the ground that the trial court should not have entertained a petition to initiate child neglect proceedings by a stranger who had not requested the aid of the responsible state agency. *Weber* v. *Stony Brook Hospital,* 60 N. Y. 2d 208, 211–213, 456 N. E. 2d 1186, 1187–1188 *(per curiam).*

While the state proceedings were in progress, on October 19, HHS received a complaint from a "private citizen" that Baby Jane Doe was being discriminatorily denied medically indicated treatment. HHS promptly referred this complaint to the New York State Child Protective Service. (The agency investigated the charge of medical neglect and soon thereafter concluded that there was no cause for state intervention.) In the meantime, before the State Child Protective Service could act, HHS on October 22, 1983, made repeated requests of the hospital to make its records available for inspection in order to determine whether the hospital was in compliance with § 504. The hospital refused the requests

and advised HHS that the parents had not consented to a release of the records.

Subsequently, on November 2, 1983, the Government filed suit in Federal District Court invoking its general authority to enforce § 504 and 45 CFR § 84.61 (1985), a regulation broadly authorizing access to information necessary to ascertain compliance. The District Court allowed the parents to intervene as defendants, expedited the proceeding, and ruled against the Government. It reasoned that the Government had no right of access to information because the record clearly established that the hospital had not violated the statute. *United States* v. *University Hospital, State Univ. of N. Y. at Stony Brook,* 575 F. Supp. 607, 614 (EDNY). Since the uncontradicted evidence established that the hospital "ha[d] at all times been willing to perform the surgical procedures in question, if only the parents . . . would consent," the hospital "failed to perform the surgical procedures in question, not because Baby Jane Doe [wa]s handicapped, but because her parents ha[d] refused to consent." *Ibid.*

The Court of Appeals affirmed. In an opinion handed down on February 23, 1984, six weeks after promulgation of the Final Rules, it agreed with the District Court that "an agency is not entitled to information sought in an investigation that 'overreaches the authority Congress has given.'" 729 F. 2d, at 150 (quoting *Oklahoma Press Publishing Co.* v. *Walling,* 327 U. S. 186, 217 (1946)). It further held that although Baby Jane Doe was a "handicapped individual," she was not "otherwise qualified" within the meaning of § 504 because "where medical treatment is at issue, it is typically the handicap itself that gives rise to, or at least contributes to the need for services"; as a result "the 'otherwise qualified' criterion of section 504 cannot be meaningfully applied to a medical treatment decision." 729 F. 2d, at 156. For the same reason, the Court of Appeals rejected the Government's argument that Baby Jane Doe had been "subjected to discrimination" under § 504: "Where the handicapping condi-

tion is related to the condition(s) to be treated, it will rarely, if ever, be possible to say with certainty that a particular decision was 'discriminatory'." *Id.*, at 157. The difficulty of applying § 504 to individual medical treatment decisions confirmed the Court of Appeals in its view that "[C]ongress never contemplated that section 504 of the Rehabilitation Act would apply to treatment decisions involving defective newborn infants when the statute was enacted in 1973, when it was amended in 1974, or at any subsequent time." *Id.*, at 161. It therefore rejected "the far-reaching position advanced by the government in this case" and concluded that until Congress had spoken, "it would be an unwarranted exercise of judicial power to approve the type of investigation that ha[d] precipitated this lawsuit." *Ibid.*

Judge Winter dissented. He pointed out that § 504 was patterned after § 601 of the Civil Rights Act of 1964, which prohibits discrimination on the basis of race in federally funded programs, and asserted that a refusal to provide medical treatment because of a person's handicapping condition is as clearly covered by § 504 as a refusal based on a person's race is covered by § 601:

> "A judgment not to perform certain surgery because a person is black is not a *bona fide* medical judgment. So too, a decision not to correct a life threatening digestive problem because an infant has Down's Syndrome is not a *bona fide* medical judgment. The issue of parental authority is also quickly disposed of. A denial of medical treatment to an infant because the infant is black is not legitimated by parental consent." *Id.*, at 162.

The Government did not file a certiorari petition in *University Hospital.* It did, however, seek review of the judgment in this case. We granted certiorari, 472 U. S. 1016 (1985), and we now affirm.

## IV

The Solicitor General is correct that "handicapped individual" as used in § 504 includes an infant who is born with a congenital defect. If such an infant is "otherwise qualified" for benefits under a program or activity receiving federal financial assistance, § 504 protects him from discrimination "solely by reason of his handicap."[9] It follows, under our decision in *Alexander* v. *Choate*, 469 U. S. 287, 301 (1985), that handicapped infants are entitled to "meaningful access" to medical services provided by hospitals, and that a hospital rule or state policy denying or limiting such access would be subject to challenge under § 504.

However, no such rule or policy is challenged, or indeed has been identified, in this case. Nor does this case, in contrast to the *University Hospital* litigation, involve a claim that any specific individual treatment decision violates § 504. This suit is not an enforcement action, and as a consequence it is not necessary to determine whether § 504 ever applies to individual medical treatment decisions involving handicapped infants. Respondents brought this litigation to challenge the four mandatory components of the Final Rules on their face,[10] and the Court of Appeals' judgment which we review merely affirmed the judgment of the District Court which "declared invalid and enjoined enforcement of [the final] regulations,

---

[9] As the case comes to us, we have no reason to review the Court of Appeals' assumption that the provision of health care to infants in hospitals receiving Medicare or Medicaid payments is a part of a "program or activity receiving Federal financial assistance." See *Consolidated Rail Corp.* v. *Darrone*, 465 U. S. 624, 635–636 (1984).

[10] See, *e. g.*, Brief in Opposition for Respondents American Medical Assn. et al. 7–8, n. 8; Record, Doc. No. 4, Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction 12 ("The Final Regulation which is challenged in this action contains four mandatory provisions" (citations omitted)); *id.*, at 28 ("After *University Hospital* . . . must fall all of the mandatory obligations imposed by the Final Regulation"). Cf. App. 138–140 (complaint of American Medical Association et al.).

purportedly promulgated pursuant to section 504 of the Rehabilitation Act of 1973, 29 U. S. C. § 794 (1982)." App. to Pet. for Cert. 2a.[11] The specific question presented by this

---

[11] It is true that the District Court, in addition to declaring "[t]he Final Regulation . . . invalid and unlawful as exceeding" § 504 and enjoining petitioner from "any further implementation of the Final Regulation," also declared invalid and enjoined "[a]ny other actions" of the Secretary "to regulate treatment involving impaired newborn infants taken under authority of Section 504, including currently pending investigation and other enforcement actions." App. to Pet. for Cert. 51a. This language must, however, be given a limited construction. The complaints in this case did not challenge the Department's authority to regulate all treatment decisions, but more precisely the mandatory provisions of the Final Rules and enforcement activity along those lines but undertaken pursuant to the Department's "general authority" to enforce § 504, as occurred in the *University Hospital* litigation and in 41 of the 49 full-scale investigations conducted by the Secretary up to that point in time. See App. 138–139 (complaint of American Medical Association et al.); *id.*, at 145 (same); *id.*, at 159 (complaint of American Hospital Association et al.). See also Record, Doc. No. 4, Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction 10–11. From these pleadings, the Court of Appeals apparently interpreted the District Court's use of the word "any" to forbid "[a]ny other actions" resembling the "currently pending investigation and other enforcement actions" specified in the injunction, App. to Pet. for Cert. 51a, rather than all possible regulatory and investigative activity that might involve the provision of health care to handicapped infants. Thus, as will become clear from our analysis of the Final Rules below, the injunction forbids continuation or initiation of regulatory and investigative activity directed at instances in which parents have refused consent to treatment and, if the Secretary were to undertake such action, efforts to seek compliance with affirmative requirements imposed on state child protective services agencies. "Because of the rightly serious view courts have traditionally taken of violations of injunctive orders, and because of the severity of punishment which may be imposed for such violation," *Pasadena City Bd. of Education* v. *Spangler*, 427 U. S. 424, 439 (1976); see *Longshoremen* v. *Marine Trade Assn.*, 389 U. S. 64, 76 (1967); *Gunn* v. *University Committee*, 399 U. S. 383, 389 (1970), the Court of Appeals properly construed the District Court's judgment as pertaining to the regulations challenged in this litigation (and enforcement activity independent of the Final Rules but paralleling the procedures set forth therein). Cf. *Schmidt* v. *Lessard*, 414 U. S. 473, 477 (1974) *(per curiam)*

case, then, is whether the four mandatory provisions of the Final Rules are authorized by § 504.

## V

It is an axiom of administrative law that an agency's explanation of the basis for its decision must include "a 'rational connnection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Assn.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc.* v. *United States*, 371 U. S. 156, 168 (1962)).[12] Agency deference has not come so far that we will uphold regulations whenever it is possible to "conceive a basis" for administrative action. To the contrary, the "presumption of

---

(noting desirability of precise construction of injunction orders to facilitate appellate review). It is, of course, the Court of Appeals' judgment that we are called on to review, not the District Court's. See *Union Pacific R. Co.* v. *Chicago, R. I. & P. R. Co.*, 163 U. S. 564, 593 (1896). Cf. *Davis* v. *Packard*, 6 Pet. 41, 49 (1832). Accordingly, we give great weight to the Court of Appeals' construction of the judgment it affirmed. Cf. *United States* v. *Colgate & Co.*, 250 U. S. 300, 301–302 (1919). For purposes of comparison, the dissent's expansive reading of the judgment is supported neither by the Court of Appeals nor by the parties. See Brief for Respondents American Medical Assn. et al. 14, 48, n. 60. Cf. Brief for Respondents American Hospital Assn. et al. 4 (quoting final judgment of the District Court). In view of the fact that we affirm this judgment on reasoning narrower than that employed by the lower courts, it bears repetition that this Court "reviews judgments, not opinions." *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842 (1984). See, *e. g.*, *Black* v. *Cutter Laboratories*, 351 U. S. 292, 297 (1956); *J. E. Riley Investment Co.* v. *Commissioner*, 311 U. S. 55, 59 (1940); *Williams* v. *Norris*, 12 Wheat. 117, 120 (1827); *McClung* v. *Silliman*, 6 Wheat. 598, 603 (1821).

[12] See *Baltimore Gas & Electric Co.* v. *Natural Resources Defense Council, Inc.*, 462 U. S. 87, 105–106 (1983); *Bowman Transportation, Inc.* v. *Arkansas-Best Freight System, Inc.*, 419 U. S. 281, 285–286 (1974); *FTC* v. *Sperry & Hutchinson Co.*, 405 U. S. 233, 249 (1972); *FPC* v. *United Gas Pipe Line Co.*, 393 U. S. 71, 72–73 (1968) *(per curiam); Siegel Co.* v. *FTC*, 327 U. S. 608, 613 (1946).

regularity afforded an agency in fulfilling its statutory mandate" is not equivalent to "the minimum rationality a statute must bear in order to withstand analysis under the Due Process Clause." *Motor Vehicle Mfrs. Assn.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S., at 43, n. 9. Thus, the mere fact that there is "some rational basis within the knowledge and experience of the [regulators]," *United States* v. *Carolene Products Co.*, 304 U. S. 144, 152 (1938) (footnote omitted), under which they "might have concluded" that the regulation was necessary to discharge their statutorily authorized mission, *Williamson* v. *Lee Optical Co.*, 348 U. S. 483, 487 (1955), will not suffice to validate agency decisionmaking. See *Industrial Union Dept.* v. *American Petroleum Inst.*, 448 U. S. 607, 639–659 (1980) (opinion of STEVENS, J.); *Burlington Truck Lines, Inc.* v. *United States*, 371 U. S. 156, 169 (1962). Our recognition of Congress' need to vest administrative agencies with ample power to assist in the difficult task of governing a vast and complex industrial Nation carries with it the correlative responsibility of the agency to explain the rationale and factual basis for its decision, even though we show respect for the agency's judgment in both.

Before examining the Secretary's reasons for issuing the Final Rules, it is essential to understand the pre-existing state-law framework governing the provision of medical care to handicapped infants. In broad outline, state law vests decisional responsibility in the parents, in the first instance, subject to review in exceptional cases by the State acting as *parens patriae.*[13] Prior to the regulatory activity culminat-

---

[13] The basic pattern of decisionmaking is well summarized in the 1983 report of the President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research:

"The paucity of directly relevant cases makes characterization of the law in this area somewhat problematic, but certain points stand out. First, there is a presumption, strong but rebuttable, that parents are the appro-

ing in the Final Rules, the Federal Government was not a participant in the process of making treatment decisions for newborn infants. We presume that this general framework was familiar to Congress when it enacted § 504. See *Cannon* v. *University of Chicago*, 441 U. S. 677, 696–697 (1979). It therefore provides an appropriate background for evaluating the Secretary's action in this case.

The Secretary has identified two possible categories of violations of § 504 as justifications for federal oversight of handicapped infant care. First, he contends that a hospital's refusal to furnish a handicapped infant with medically beneficial treatment "solely by reason of his handicap" constitutes unlawful discrimination. Second, he maintains that a hospital's failure to report cases of suspected medical neglect to a

---

priate decisionmakers for their infants. Traditional law concerning the family, buttressed by the emerging constitutional right of privacy, protects a substantial range of discretion for parents. Second, as persons unable to protect themselves, infants fall under the *parens patriae* power of the state. In the exercise of this authority, the state not only punishes parents whose conduct has amounted to abuse or neglect of their children but may also supervene parental decisions before they become operative to ensure that the choices made are not so detrimental to a child's interests as to amount to neglect and abuse.

". . . [A]s long as parents choose from professionally accepted treatment options the choice is rarely reviewed in court and even less frequently supervened. The courts have exercised their authority to appoint a guardian for a child when the parents are not capable of participating in the decisionmaking or when they have made decisions that evidence substantial lack of concern for the child's interests. Although societal involvement usually occurs under the auspices of governmental instrumentalities — such as child welfare agencies and courts — the American legal system ordinarily relies upon the private initiative of individuals, rather than continuing governmental supervision, to bring the matter to the attention of legal authorities." Report, at 212–214 (footnotes omitted).

This summary accords with the Secretary's understanding of the state-law framework, at least in other contexts. See 50 Fed. Reg. 14880 (1985) (final rule implementing Child Abuse Amendments of 1984) ("The decision to provide or withhold medically indicated treatment is, except in highly unusual circumstances, made by the parents or legal guardian").

state child protective services agency may also violate the statute. We separately consider these two possible bases for the Final Rules.[14]

_____

[14] Rather than address these issues, JUSTICE WHITE's dissent would remand to the Court of Appeals. See *post*, at 656. In light of its willingness to address the broader hypothetical question whether § 504 ever authorizes regulation of medical treatment decisions—"even if the judgment below were limited to invalidation of these regulations," *post*, at 650, n. 4—it comes as something of a surprise to read the references to the Solicitor General's argument that "this claim in its current form is not properly in the case," *post*, at 657, n. 9. The procedural objections are plainly without substance. Respondents AMA et al. raised the lack of factual support in their brief in opposition to the petition for certiorari. See Brief in Opposition for Respondents American Medical Assn. et al. 20 ("First, the fundamental problem with the Secretary's position is that it is based on a situation that has not occurred—and will not occur—in real life. . . . Not surprisingly, the Secretary cites no case where [his hypothetical problem] has occurred"); *id.*, at 20–21; *id.*, at 26 ("B. The Secretary Has Shown No Problem With the Historic State Law Framework That Warrants Direct Federal Investigation and Regulation"); *id.*, at 26–29. The Solicitor General, although responding that such evidence exists, see Reply Memorandum for Petitioner 9, did not raise a procedural bar. As a result, the objection is waived. See *Oklahoma City* v. *Tuttle*, 471 U. S. 808, 815–816 (1985). Although further discussion of this objection is therefore unnecessary, the dissent is also wrong in suggesting that respondents' complaints did not raise "the lack of a factual basis involving situations in which parents *have* consented to treatment." *Post*, at 657, n. 9. In fact, the complaint of respondents AMA et al. alleged "COUNT II: Violation of the Administrative Procedure Act," App. 146, and incorporated by reference the allegation that "None of the mandatory provisions of the Final Regulation have a basis in fact or are designed to meet a documented problem," *id.*, at 140. Accord, *id.*, at 158 (complaint of respondents AHA et al.). The fact that our decision rests on grounds narrower than that relied on by the lower courts is surely not an infirmity. We can only add that the lack of factual support for these regulations was fully briefed in this Court, see especially Brief for Respondents American Medical Assn. et al. 39–41; Brief for Respondents American Hospital Assn. et al. 48–49, and the fact that the Solicitor General responds with so little, so late bespeaks the absence of evidentiary support for the regulations, not an inadequate opportunity to direct us to it.

The Solicitor General also contends, for the first time in his reply brief on the merits, see Reply Brief for Petitioner 16, n. 6, that the Final Rules are

## VI

In the immediate aftermath of the Bloomington Baby Doe incident, the Secretary apparently proceeded on the assumption that a hospital's statutory duty to provide treatment to handicapped infants was unaffected by the absence of parental consent. See *supra*, at 617–619. He has since abandoned that view. Thus, the preamble to the Final Rules correctly states that when "a non-treatment decision, no matter how discriminatory, is made by parents, rather than by the hospital, section 504 does not mandate that the hospital unilaterally overrule the parental decision and provide treatment notwithstanding the lack of consent." 49 Fed. Reg. 1631 (1984). A hospital's withholding of treatment when no parental consent has been given cannot violate § 504, for without the consent of the parents or a surrogate decisionmaker the infant is neither "otherwise qualified" for treatment nor has he been denied care "solely by reason of his handicap." [15] Indeed, it would almost certainly be a tort as a matter of state law to operate on an infant without parental consent. This analysis makes clear that the Government's heavy reliance on the analogy to race-based refusals which violate § 601

---

"interpretative guidelines" which "merely explained the Secretary's construction of Section 504 in this setting," *ibid.* This assertion was rejected the only occasion on which it was tendered, see *American Academy of Pediatrics* v. *Heckler*, 561 F. Supp. 395, 401 (DC 1983), is belied by the Secretary's own decision to provide notice and request comment on the regulations, cf. 5 U. S. C. § 553(b), and is patently without merit. To its credit, the dissent does not ultimately rely on either of these arguments. See *post*, at 657, n. 9.

[15] Just as "[t]he failure of the hospital to itself provide the treatment" because of the unavailability of medical equipment or expertise would not be "on the basis of the handicap" but "on the fact that the hospital is incapable of providing the treatment," according to the Secretary's regulations, 49 Fed. Reg. 1637 (1984), it is equally clear that a refusal to provide care because of the absence of parental consent would not be "solely by reason of [the infant's] handicap."

of the Civil Rights Act is misplaced. If, pursuant to its normal practice, a hospital refused to operate on a black child whose parents had withheld their consent to treatment, the hospital's refusal would not be based on the race of the child even if it were assumed that the parents based *their decision* entirely on a mistaken assumption that the race of the child made the operation inappropriate.

Now that the Secretary has acknowledged that a hospital has no statutory treatment obligation in the absence of parental consent, it has become clear that the Final Rules are not needed to prevent hospitals from denying treatment to handicapped infants. The Solicitor General concedes that the administrative record contains no evidence that hospitals have ever refused treatment authorized either by the infant's parents or by a court order. Tr. of Oral Arg. 8. Even the Secretary never seriously maintained that posted notices, "hotlines," and emergency on-site investigations were necessary to process complaints against hospitals that might refuse treatment requested by parents. The parental interest in calling such a refusal to the attention of the appropriate authorities adequately vindicates the interest in enforcement of § 504 in such cases, just as that interest obviates the need for a special regulation to deal with refusals to provide treatment on the basis of race which may violate § 601 of the Civil Rights Act.

The Secretary's belated recognition of the effect of parental nonconsent is important, because the supposed need for federal monitoring of hospitals' treatment decisions rests *entirely* on instances in which parents have refused their consent. Thus, in the Bloomington, Indiana, case that precipitated the Secretary's enforcement efforts in this area,[16] as

---

[16] The Secretary's summary of this case makes it clear that the hospital's failure to perform surgery was based on the parents' refusal of consent:

*"Bloomington, Indiana.* Investigation into April 1982, death of infant with Down's syndrome and esophageal atresia from whom surgery was

well as in the *University Hospital* case that provided the basis for the summary affirmance in the case now before us,[17] the hospital's failure to perform the treatment at issue rested on the lack of parental consent. The Secretary's own summaries of these cases establish beyond doubt that the respective hospitals did not withhold medical care on the basis of handicap and therefore did not violate § 504; as a result, they provide no support for his claim that federal regulation is needed in order to forestall comparable cases in the future.

The Secretary's initial failure to recognize that withholding of consent by *parents* does not equate with discriminatory denial of treatment by *hospitals* likewise undermines the Secretary's findings in the preamble to his proposed rulemaking. In that statement, the Secretary cited four sources in support of the claim that "Section 504 [is] not being uniformly followed." 48 Fed. Reg. 30847 (1983). None of the cited examples, however, suggests that recipients of federal financial assistance, as opposed to parents, had withheld medical care on the basis of handicap.[18]

---

withheld *on the instructions of the parents." Id.*, at 1646 (emphasis added).

As recounted earlier, the hospital initiated judicial review to override the parents' decision, but its efforts proved unavailing. The Solicitor General now acknowledges that there was no basis for finding a violation of § 504 in this case. See Tr. of Oral Arg. 12.

[17] Notwithstanding that the Secretary's summary of this case demonstrates both that treatment was withheld because of refusal of parental consent and that state-court proceedings to override the parents' decision had been instituted before the Department intervened, the Department proceeded with its own investigation anyway:

"*Long Island, New York.* October 19, 1983, complaint, based on newspaper article, that infant with spina bifida not receiving surgery *due to refusal of parents to consent; legal proceedings ha[d] been initiated in State court.* Inquiry initiated October 19. On October 27, HHS asked Department of Justice to commence legal action to overcome refusal of hospital to permit review of pertinent records." 49 Fed. Reg. 1649 (1984) (emphasis added).

[18] The Secretary first cited a 1973 survey by Raymond Duff and A. G. M. Campbell calculating that 14% of deaths in the special nursery of the Yale-

Notwithstanding the ostensible recognition in the preamble of the effect of parental nonconsent on a hospital's obligation to provide care, in promulgating the Final Rules the Secretary persisted in relying on instances in which parents had refused consent to support his claim that, regardless of its "magnitude," there is sufficient evidence of "illegality" to justify "establishing basic mechanisms to allow for effective enforcement of a clearly applicable statute." 49 Fed. Reg. 1645 (1984). We have already discussed one source of this evidence—"the several specific cases cited in the preamble to the proposed rule." *Ibid.* Contrary to the Secretary's belief, these cases do *not* "support the proposition that handicapped infants may be subjected to unlawful discrimination." *Ibid.* In addition to the evidence relied on in prior notices, the Secretary included a summary of the 49 "Infant Doe

New Haven hospital "were related to withholding treatment." 48 Fed. Reg. 30847 (1983). The Secretary's solitary quotation from this study, accurately illustrating the locus of the treatment decisions reviewed by the authors, involved refusal of parental consent:

"'An infant with Down's syndrome and intestinal atresia, like the much publicized one at Johns Hopkins Hospital, was not treated *because his parents thought the surgery was wrong for their baby and themselves.* He died several days after birth.'" *Ibid.* (emphasis added) (quoting Duff & Campbell, Moral and Ethical Dilemmas in the Special-Care Nursery, 289 New Eng. J. Med. 890, 891 (1973)).

The Secretary next referred to an incident at Johns Hopkins Hospital which, as the above quotation intimates, also concerned parental refusal of consent. Then followed brief mention of the "Bloomington Baby Doe" incident, in which the parents, as the Secretary now admits, refused consent to treatment despite the hospital's insistence that it be provided. The Secretary's fourth and final example involved "a 1979 death of an infant with Down's syndrome and an intestinal obstruction at the Kapiolani-Children's Medical Center in Honolulu, Hawaii," 48 Fed. Reg. 30847 (1983), which again appears to have resulted from "a lack of parental consent," *id.*, at 30848.

Generalizing from these examples, the Secretary reported the results of a survey of physician attitudes. He faulted "[t]heir acquiescence in nontreatment of Down's children" which he surmised was "apparently *because of* the handicap represented by Down's syndrome." *Ibid.* See n. 22, *infra.*

cases" that the Department had processed before December 1, 1983.[19] Curiously, however, by the Secretary's own admission *none* of the 49 cases had "resulted in a finding of discriminatory withholding of medical care." *Id.*, at 1649. In fact, in the entire list of 49 cases there is no finding that a hospital failed or refused to provide treatment to a handicapped infant for which parental consent had been given.[20]

Notwithstanding this concession, the Secretary "believes three of these cases demonstrate the utility of the procedural

---

[19] The Secretary also reprinted selected quotations from various commenters reporting the existence of "discriminatory" decisions denying sustenance and care to handicapped infants. None of these comments disclosed whether those "discriminatory" decisions were made by parents or by hospitals.

[20] The Secretary's repeated inability to identify a single treatment decision in violation of § 504 lends an aura of unreality to JUSTICE WHITE's criticism of the Court of Appeals' decision in *University Hospital*. In explaining why he believes "the stated basis for the Court of Appeals' holding in *University Hospital* was incorrect," *post*, at 656; see *post*, at 655, n. 8, JUSTICE WHITE completely ignores the fact that the case involved a specific treatment decision made by parents. Since JUSTICE WHITE elsewhere agrees that parental decisions are not covered by § 504, *post*, at 657, n. 10, and that the infant involved in the *University Hospital* case was therefore not "otherwise qualified" for treatment, *post*, at 654, n. 7, he implicitly acknowledges that the *judgment* in *University Hospital* is correct; only by ignoring the actual facts of that case—as well as the actual facts of the 49 cases that were investigated by the Secretary—and speculating about nonexistent hypothetical cases in which a hospital might refuse to provide treatment requested by parents, does the dissent offer any basis for questioning the decision in *University Hospital*.

Indeed, even the dissent's criticism of the *reasoning* of the Court of Appeals' decision is based on a hypothetical situation that the Court of Appeals did not address. That court was concerned with the treatment of cases in which "the handicapping condition *is related* to the condition(s) to be treated," 729 F. 2d, at 157 (emphasis added); see *id.*, at 147, whereas JUSTICE WHITE has carefully limited his hypothetical discussion to cases in which "the treatment *is completely unrelated* to the baby's handicapping condition." *Post*, at 655 (emphasis added). Thus, like bishops of opposite colors, the opinions of JUSTICE WHITE and the Court of Appeals do not even touch one another.

mechanisms called for in the final rules." *Ibid.* Accord, *ibid.* ("[T]hese cases provide additional documentation of the need for governmental involvement and the appropriateness of the procedures established by the final rules"). However, these three cases, which supposedly provide the strongest support for federal intervention, fail to disclose any discrimination against handicapped newborns in violation of § 504. For example, in Robinson, Illinois, the Department conducted an on-site investigation when it learned that the "hospital *(at the parents' request)* failed to perform necessary surgery." *Id.*, at 1646 (emphasis added). After "[t]he parents refused consent for surgery," "the hospital referred the matter to state authorities, who accepted custody of the infant and arranged for surgery and adoption," all "in compliance with section 504." *Ibid.* The Secretary concluded that "the involvement of the state child protective services agency," at the behest of the hospital, "was the most important element in bringing about corrective surgery for the infant. . . . Had there been no *governmental* involvement in the case, the outcome might have been much less favorable." *Id.*, at 1649 (emphasis added).[21]

The Secretary's second example illustrates with even greater force the effective and nondiscriminatory functioning of state mechanisms and the consequent lack of support for federal intervention. In Daytona Beach, Florida, the Department's hotline received a complaint of medical neglect of a handicapped infant; immediate contact with the hospital and state agency revealed that "the parents did not consent to surgery" for the infant. *Id.*, at 1648. Notwithstanding this information, which was confirmed by both the hospital and the state agency, and despite the fact that the state agency had "obtained a court order to provide surgery" the day *before* HHS was notified, the Department conducted an

---

[21] The preamble repeatedly makes the assumption that evidence showing the need for *governmental* involvement provides a basis for *federal* involvement. See, *e. g.*, 49 Fed. Reg. 1649 (1984).

on-site investigation. *Ibid.* In the third case, in Colorado Springs, Colorado, the Department intervened so soon after birth that "the decisionmaking process was in progress at the time the OCR [Office of Civil Rights] inquiry began," and "it is impossible to say the surgery would not have been provided without this involvement." *Id.*, at 1649. "However," the Secretary added, "the involvement of OCR and the OCR medical consultant was cooperatively received by the hospital and apparently constructive." *Ibid.*

In sum, there is nothing in the administrative record to justify the Secretary's belief that "discriminatory withholding of medical care" in violation of § 504 provides any support for federal regulation: In two of the cases (Robinson, Illinois, and Daytona Beach, Florida), the hospital's refusal was based on the absence of parental consent, but the parents' decision was overridden by state authorities and the operation was performed; in the third case (Colorado Springs, Colorado) it is not clear whether the parents would have given their consent or not, but the corrective surgery was in fact performed.[22]

---

[22] JUSTICE WHITE's dissent suggests that regulation of health care providers can be justified on a theory the Secretary did not advance—a supposed need to curtail discriminatory advice by biased physicians. See *post*, at 658–661. After observing that at least some handicapped infants have not been treated, the dissent identifies physician attitudes as a likely explanation and concludes that mandated informational notices were presumably designed to "foste[r] an awareness by health care professionals of their responsibility not to act in a discriminatory manner with respect to medical treatment decisions for handicapped infants." *Post*, at 660.

The dissent's theory finds no support in the text of the regulation, the reasoning of the Secretary, or the briefs filed on his behalf in this Court. The regulations in general—and the informational notices in particular—do not purport to place any constraints on the advice that physicians may give their patients. Moreover, since it is now clear that parental decisionmaking is not covered by § 504, *supra*, at 630–631, the dissent's theory rests on the unstated premise that the statute may prevent the giving of advice to do something which § 504 does not itself prohibit. It is hardly obvious that the Rehabilitation Act of 1973 prohibits physicians from "aiding and abet-

## VII

As a backstop to his manifestly incorrect perception that withholding of treatment in accordance with parental instructions necessitates federal regulation, the Secretary contends that a hospital's failure to report parents' refusals to consent to treatment violates § 504, and that past breaches of this kind justify federal oversight.

By itself, § 504 imposes no duty to report instances of medical neglect—that undertaking derives from state-law reporting obligations or a hospital's own voluntary practice. Although a hospital's selective refusal to report medical neglect of handicapped infants might violate § 504,[23] the Secretary

---

ting" a parental decision which parents admittedly have a right to make. And if Congress did intend this counterintuitive result, one might expect an explanation from the Secretary as to how the hotlines and emergency on-site inspections contemplated by the Final Rules square with the constitutional doctrines on regulation, direct or indirect, of speech in general and of decisionmaking by health professionals in particular.

In reality, the Secretary neither found nor implied that physicians' predispositions against treating handicapped infants had resulted in parental refusals to consent to treatment. Indeed, he principally relied on attitudinal surveys for the converse proposition that regulation is necessary because parents refuse consent to treatment and physicians will "acquiesce in parental refus[als] to treat." 48 Fed. Reg. 30848 (1983). To the extent *any* theory may be discerned in the Secretary's two-column summary of physician surveys, it is that doctors would not *correct* "bad" parental decisions, not that they were responsible for helping them to make such choices in the first place. Moreover, even if the Secretary had relied on this evidence to insinuate that doctors imposed their own value judgments on parents by lobbying them to refuse consent, he never explains that the parental decisionmaking process is one in which doctors exercise the decisive influence needed to force such results. Compare *ibid.*, with *post*, at 658–659. The Secretary, in short, has not even adumbrated a theory of "discrimination" remotely resembling the one invented by the dissent, and therefore has not made the essential connection between the evidence of physician attitudes and the regulatory choice made here.

[23] Of course, § 504 would be violated only if the hospital failed to report medical neglect of a handicapped infant when it would report such neglect of a similarly situated nonhandicapped infant. Because respondents have

has failed to point to any specific evidence that this has occurred.   The 49 actual investigations summarized in the preamble to the Final Rules do not reveal *any* case in which a hospital either failed, or was accused of failing, to make an appropriate report to a state agency.[24]   Nor can we accept the Solicitor General's invitation to infer discriminatory nonreporting from the studies cited in the Secretary's proposed rulemaking.   Even assuming that cases in which parents have withheld consent to treatment for handicapped infants have gone unreported, that fact alone would not prove

---

challenged the Secretary's regulations on their face, we have no occasion to address the question whether infants with birth defects are similarly situated with infants in need of blood transfusions (the paradigm case in which hospitals have reported or have sought to override parental decisions, according to the Solicitor General, Brief for Petitioner 28, and n. 16), or whether a hospital could legitimately distinguish between the two situations on the basis of the different risks and benefits inhering in certain operations to correct birth defects, on the one hand, and blood transfusions, on the other hand.

[24] To the contrary, the Secretary's case summaries reveal numerous instances in which hospitals have voluntarily reported instances of suspected medical neglect and have even initiated legal proceedings themselves.   In the Bloomington, Indiana, case which prompted these regulations, and in the *University Hospital* case which supported the summary affirmance now before us, the parents' decision was the subject of judicial review in the state courts.   In the Robinson, Illinois, case on which the Secretary relies as one of three examples illustrating the need for federal regulation, the hospital reported the parents' refusal to consent to state authorities who arranged for surgery and adoption.   49 Fed. Reg. 1646 (1984).   Most dramatically, in the Daytona Beach, Florida, case HHS received its hotline complaint the day *after* the state agency had already obtained a court order overriding the parents' refusal to consent to surgery.   *Id.*, at 1648.   Notwithstanding the Department's "immediate contact" with the hospital *and the state agency*—which surely must have made it clear that the case had already been reported to that agency and that there was no colorable basis for suspecting a violation of § 504—the Department conducted an on-site investigation.   *Ibid.*   In the third case on which the Secretary placed special emphasis, the Department intervened before the parents had decided whether to authorize treatment or not, so that no reporting obligation could have been triggered.   *Ibid.*

that the hospitals involved had discriminated on the basis of handicap rather than simply failed entirely to discharge their state-law reporting obligations, if any, a matter which lies wholly outside the nondiscrimination mandate of § 504.

The particular reporting mechanism chosen by the Secretary—indeed the entire regulatory framework imposed on state child protective services agencies—departs from the nondiscrimination mandate of § 504 in a more fundamental way. The mandatory provisions of the Final Rules omit any direct requirement that hospitals make reports when parents refuse consent to recommended procedures.[25] Instead, the Final Rules command *state agencies* to require such reports, regardless of the state agencies' own reporting requirements (or lack thereof). 45 CFR § 84.55(c)(1)(i) (1985). Far from merely preventing state agencies from remaining calculatedly indifferent to handicapped infants while they tend to the needs of the similarly situated nonhandicapped, the Final Rules command state agencies to utilize their "full authority" to "prevent instances of unlawful medical neglect of handicapped infants." § 84.55(c)(1). The Rules effectively make medical neglect of handicapped newborns a state investigative priority, possibly forcing state agencies to shift scarce resources away from other enforcement activities— perhaps even from programs designed to protect handicapped children outside hospitals. The Rules also order state agencies to "immediate[ly]" review reports from hospitals, § 84.55(c)(1)(iii), to conduct "on-site investigation[s]," *ibid.*, and to take legal action "to compel the provision of necessary nourishment and medical treatment,"

---

[25] The interpretative guidelines appended to the Final Rules do impose on hospitals and other health care providers the duty not to discriminate against handicapped infants in reporting instances of parental neglect. We do not address the question whether reporting, either as a hospital practice or as a requirement of state law, constitutes a "program or activity receiving Federal financial assistance" under § 504. See *Consolidated Rail Corp.* v. *Darrone*, 465 U. S., at 635–636. Cf. *Grove City College* v. *Bell*, 465 U. S. 555, 570–574 (1984).

§ 84.55(c)(1)(iv)—all without any regard to the procedures followed by state agencies in handling complaints filed on behalf of nonhandicapped infants. These operating procedures were imposed over the objection of several state child protective services agencies that the requirement that they turn over reports to HHS "conflicts with the confidentiality requirements of state child abuse and neglect statutes," 49 Fed. Reg. 1627 (1984)—thereby requiring under the guise of nondiscrimination a service which state law denies to the nonhandicapped.[26]

The complaint-handling process the Secretary would impose on unwilling state agencies is totally foreign to the authority to prevent discrimination conferred on him by § 504. "Section 504 seeks to assure evenhanded treatment," *Alexander* v. *Choate*, 469 U. S., at 304; "neither the language, purpose, nor history of § 504 reveals an intent to impose an affirmative-action obligation" on recipients of federal financial assistance, *Southeastern Community College* v. *Davis*, 442 U. S. 397, 411 (1979).[27] The Solicitor General also recognizes that § 504 is concerned with discrimination and with discrimination alone. In his attempt to distinguish the Secretary's 1976 determination that it "is beyond the authority of section 504" to promulgate regulations "concerning ade-

---

[26] JUSTICE WHITE's dissent, quoting the Secretary's explanation for these requirements, concludes that they form, in "substance," a nondiscrimination requirement. *Post*, at 663. This assertion is repetitive, not responsive. The rules governing state child protective services agencies operate independently of any provisions of state law; they go further than them in several respects; they flatly contradict them in others (*e. g.*, confidentiality); and they do not accommodate the revision, modification, or repeal of state laws. To say that the Secretary can give detailed marching orders to state agencies upon discovering that both the agencies and HHS are working toward the same general objective—at least when defined with sufficient abstractness—would countenance a novel and serious intrusion on state autonomy.

[27] See *Southeastern Community College* v. *Davis*, 442 U. S., at 410 (language and structure of 1973 Rehabilitation Act recognizes "the distinction between . . . evenhanded treatment . . . and affirmative efforts").

quate and appropriate psychiatric care or safe and humane living conditions for persons institutionalized because of handicap or concerning payment of fair compensation to patients who perform work," 41 Fed. Reg. 29548, 29559, the Solicitor General explains:

"This conclusion of course was consistent with the fact that, as relevant here, Section 504 is essentially concerned only with discrimination in the *relative* treatment of handicapped and nonhandicapped persons and does not confer any *absolute* right to receive particular services or benefits under federally assisted programs." Brief for Petitioner 40, n. 33.

See also 48 Fed. Reg. 30846 (1983) ("Section 504 is in essence an equal treatment, non-discrimination standard").[28]

The Final Rules, however, impose just the sort of absolute obligation on state agencies that the Secretary had previously disavowed. The services state agencies are required to make available to handicapped infants are in no way tied to the level of services provided to similarly situated nonhandicapped infants. Instead, they constitute an *"absolute* right to receive particular services or benefits" under a federally assisted program. Even if a state agency were scrupulously impartial as between the protection it offered handicapped and nonhandicapped infants, it could still be denied federal funding for failing to carry out the Secretary's mission with sufficient zeal.

It is no answer to state, as does the Secretary, that these regulations are a necessary "'metho[d] . . . to give reasonable· assurance' of compliance." 49 Fed. Reg. 1627 (1984) (quoting 45 CFR § 80.4(b), which requires state agencies to

---

[28] The Secretary notes that "by enacting section 504 Congress intended to eliminate all of the 'many forms of potential discrimination' against handicapped people through 'the establishment of a broad governmental policy.' S. Rep. No. 1297, 93d Cong., 2d Sess. 38 (1974)." 49 Fed. Reg. 1636 (1984). But no matter how broad the prohibition contained in § 504 may be, what it prohibits is discrimination.

report on their compliance with Title VI). For while the Secretary can require state agencies to document their *own* compliance with § 504, nothing in that provision authorizes him to commandeer state agencies to enforce compliance by *other* recipients of federal funds (in this instance, hospitals). State child protective services agencies are not field offices of the HHS bureaucracy, and they may not be conscripted against their will as the foot soldiers in a federal crusade.[29] As we stated in *Alexander* v. *Choate*, 469 U. S., at 307, "nothing in the pre- or post-1973 legislative discussion of § 504 suggests that Congress desired to make major inroads on the States' longstanding discretion to choose the proper mix" of services provided by state agencies.

## VIII

Section 504 authorizes any head of an Executive Branch agency—regardless of his agency's mission or expertise—to promulgate regulations prohibiting discrimination against the handicapped. See S. Rep. No. 93–1297, pp. 39–40 (1974).[30] As a result of this rulemaking authority, the Secretary of

---

[29] Important principles of federalism are implicated by any "federal program that compels state agencies . . . to function as bureaucratic puppets of the Federal Government." *FERC* v. *Mississippi*, 456 U. S. 742, 783 (1982) (opinion of O'CONNOR, J.).

[30] Twenty-seven agencies, including the National Endowment for the Arts, the Nuclear Regulatory Commission, and the Tennessee Valley Authority, have promulgated regulations forbidding discrimination on the basis of handicap in programs or activities receiving federal financial assistance. The Department of Housing and Urban Development has issued a proposed rulemaking. See Jones & Wolfe, Regulations Promulgated Pursuant to Section 504 of the Rehabilitation Act of 1973: A Brief History and Present Status 8–9 (Congressional Research Service, Feb. 28, 1986). There is thus not the same basis for deference predicated on expertise as we found with respect to the Environmental Protection Agency's interpretation of the 1977 Clean Air Act Amendments in *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S., at 842–845, and with respect to the Federal Reserve Board's construction of the Bank Holding Act in *Board of Governors, FRS* v. *Investment Company Inst.*, 450 U. S. 46, 56, and n. 21 (1981).

HHS has "substantial leeway to explore areas in which discrimination against the handicapped pos[es] particularly significant problems and to devise regulations to prohibit such discrimination." *Alexander* v. *Choate*, 469 U. S., at 304, n. 24.

Even according the greatest respect to the Secretary's action, however, deference cannot fill the lack of an evidentiary foundation on which the Final Rules must rest. The Secretary's basis for federal intervention is perceived discrimination against handicapped infants in violation of § 504, and yet the Secretary has pointed to no evidence that such discrimination occurs. Neither the fact that regulators generally may rely on generic information in a particular field or comparable experience gained in other fields, nor the fact that regulations may be imposed for preventative or prophylactic reasons, can substitute for evidence supporting the Secretary's own chosen rationale. For the principle of agency accountability recited earlier means that "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Motor Vehicle Mfrs. Assn.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S., at 50 (citations omitted).[31]

The need for a proper evidentiary basis for agency action is especially acute in this case because Congress has failed to indicate, either in the statute or in the legislative history, that it envisioned federal superintendence of treatment decisions traditionally entrusted to state governance. "[W]e must assume that the implications and limitations of our federal system constitute a major premise of all congressional legislation, though not repeatedly recited therein." *United States* v. *Gambling Devices*, 346 U. S. 441, 450 (1953) (opin-

---

[31] Accord, *American Textile Mfrs. Institute, Inc.* v. *Donovan*, 452 U. S. 490, 539 (1981); *Burlington Truck Lines, Inc.* v. *United States*, 371 U. S. 156, 168 (1962); *SEC* v. *Chenery Corp.*, 332 U. S. 194, 196 (1947); *SEC* v. *Chenery Corp.*, 318 U. S. 80, 87 (1943).

ion of Jackson, J.).[32]   Congress therefore "will not be deemed to have significantly changed the federal-state balance," *United States* v. *Bass,* 404 U. S. 336, 349 (1971)—or to have authorized its delegates to do so—"unless otherwise the purpose of the Act would be defeated," *FTC* v. *Bunte Bros., Inc.,* 312 U. S. 349, 351 (1941).[33]   Although the nondiscrimi-

[32] See Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum. L. Rev. 527, 540 (1947) ("The underlying assumptions of our dual form of government, and the consequent presuppositions of legislative draftsmanship which are expressive of our history and habits, cut across what might otherwise be the implied range of legislation").

[33] Cf. *Heublein, Inc.* v. *South Carolina Tax Comm'n,* 409 U. S. 275, 281–282 (1972) (" '[U]nless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the Federal-State balance.'" (quoting *United States* v. *Bass,* 404 U. S., at 349); *Davies Warehouse Co.* v. *Bowles,* 321 U. S. 144, 152 (1944) ("Where Congress has not clearly indicated a purpose to precipitate conflict [between federal agencies and state authority] we should be reluctant to do so by decision" (footnote omitted)); *Penn Dairies, Inc.* v. *Milk Control Comm'n,* 318 U. S. 261, 275 (1943) ("An unexpressed purpose of Congress to set aside statutes of the states regulating their internal affairs is not lightly to be inferred and ought not to be implied where the legislative command, read in the light of its history, remains ambiguous"); *FTC* v. *Bunte Bros., Inc.,* 312 U. S., at 354–355 ("The construction of § 5 [of the Federal Trade Commission Act] urged by the Commission would thus give a federal agency pervasive control over myriads of local businesses in matters heretofore traditionally left to local custom or local law. . . . An inroad upon local conditions and local standards of such far-reaching import as is involved here, ought to await a clearer mandate from Congress"); *Apex Hosiery Co.* v. *Leader,* 310 U. S. 469, 513 (1940) ("The maintenance in our federal system of a proper distribution between state and national governments of police authority and of remedies private and public for public wrongs is of far-reaching importance.   An intention to disturb the balance is not lightly to be imputed to Congress"); *United States* v. *Altobella,* 442 F. 2d 310, 313–316 (CA7 1971); 3 C. Sands, Sutherland on Statutory Construction § 62.01, p. 64 (4th ed. 1974) ("[T]he rule of strict construction [of statutes in derogation of sovereignty] serves a quasi-constitutional purpose in our federal system of split sovereignty by helping to secure both levels of sovereign power against encroachment by each other" (footnote omitted)).

The legislative history of the Rehabilitation Act does not support the notion that Congress intended intervention by federal officials into treatment

nation mandate of § 504 is cast in language sufficiently broad to suggest that the question is "not one of authority, but of its appropriate exercise[,] [t]he propriety of the exertion of the authority must be tested by its relation to the purpose of the [statutory] grant and with suitable regard to the principle that whenever the federal power is exerted within what would otherwise be the domain of state power, the justification of the exercise of the federal power must clearly appear." *Florida* v. *United States*, 282 U. S. 194, 211–212 (1931). Accord, *Chicago, M., St. P. & P. R. Co.* v. *Illinois*, 355 U. S. 300, 306 (1958). That is, "it must appear that there are findings, supported by evidence, of the essential facts . . . which would justify [the Secretary's] conclusion." *Florida* v. *United States*, 282 U. S., at 212. The administrative record does not contain the reasoning and evidence that is necessary to sustain federal intervention into a historically state-administered decisional process that appears—for lack of any evidence to the contrary—to be functioning in full compliance with § 504.

The history of these regulations exposes the inappropriateness of the extraordinary deference—virtually a *carte blanche*—requested by the Government. The Secretary's

---

decisions traditionally left by state law to concerned parents and the attending physicians or, in exceptional cases, to state agencies charged with protecting the welfare of the infant. As the Court of Appeals noted, there is nothing in the legislative history that even remotely suggests that Congress contemplated the possibility that "section 504 could or would be applied to treatment decisions, involving defective newborn infants." 729 F. 2d 144, 159 (1984).

"'As far as can be determined, no congressional committee or member of the House or Senate ever even suggested that section 504 would be used to monitor medical treatment of defective newborn infants or establish standards for preserving a particular quality of life. No medical group appeared alert to the intrusion into medical practice which some doctors apprehend from such an undertaking, nor were representatives of parents or spokesmen for religious beliefs that would be affected heard.'" *Id.*, at 158 (quoting *American Academy of Pediatrics* v. *Heckler*, 561 F. Supp., at 401).

present reading of § 504 has evolved only after previous, patently erroneous interpretations had been found wanting.[34] The checkered history of these regulations began in 1982, when the Department notified hospitals that they would violate § 504 if they "allow[ed] an infant" to remain in their care after "the infant's parents or guardian [had withheld consent to] treatment or nourishment discriminatorily." 47 Fed. Reg. 26027. By the time the Proposed Rules were announced one year later, the Secretary had abandoned that construction. But the Department substituted the equally untenable view that "the basic provision of nourishment, fluids, and routine nursing care" was "not an option for medical judgment" and that "[t]he decision to forego medical treatment of a correctable life-threatening defect because an infant also suffers from a permanent irremediable handicap that is not life-threatening, such as mental retardation, is a violation of Section 504," insinuating by omission that lack of parental consent did not alter the hospital's obligation to provide corrective surgery. 48 Fed. Reg. 30852, 30847 (1983). Although the preamble to the Final Rules corrects the prior erroneous signals from the Department that § 504 authorizes it to override parental decisions and to save the lives of handicapped infants, it persists in advocating federal regulation on the basis of treatment denials precipitated by refusals of parental consent and on the ground that its experience with the Baby Doe hotline has demonstrated that "the assumption that handicapped infants will receive medically beneficial treatment is not always justified." 49 Fed. Reg. 1646 (1984).

This response, together with its previous remarks, makes irresistible the inference that the Department regards its

---

[34] The fact that the agency's interpretation "has been neither consistent nor longstanding . . . substantially diminishes the deference to be given to HEW's [now HHS's] present interpretation of the statute." *Southeastern Community College* v. *Davis,* 442 U. S., at 412, n. 11 (citing *General Electric Co.* v. *Gilbert,* 429 U. S. 125, 143 (1976)).

mission as one principally concerned with the quality of medical care for handicapped infants rather than with the implementation of § 504. We could not quarrel with a decision by the Department to concentrate its finite compliance resources on instances of life-threatening discrimination rather than instances in which merely elective care has been withheld. Cf. *Heckler* v. *Chaney*, 470 U. S. 821 (1985). But nothing in the statute authorizes the Secretary to dispense with the law's focus on discrimination and instead to employ federal resources to save the lives of handicapped newborns, without regard to whether they are victims of discrimination by recipients of federal funds or not. Section 504 does not authorize the Secretary to give unsolicited advice either to parents, to hospitals, or to state officials who are faced with difficult treatment decisions concerning handicapped children. We may assume that the "qualified professionals" employed by the Secretary may make valuable contributions in particular cases, but neither that assumption nor the sincere conviction that an immediate "on-site investigation" is "necessary to protect the life or health of a handicapped individual" can enlarge the statutory powers of the Secretary.

The administrative record demonstrates that the Secretary has asserted the authority to conduct on-site investigations, to inspect hospital records, and to participate in the decisional process in emergency cases in which there was no colorable basis for believing that a violation of § 504 had occurred or was about to occur. The District Court and the Court of Appeals correctly held that these investigative actions were not authorized by the statute and that the regulations which purport to authorize a continuation of them are invalid.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

CHIEF JUSTICE BURGER concurs in the judgment.

JUSTICE REHNQUIST took no part in the consideration or decision of this case.

JUSTICE WHITE, with whom JUSTICE BRENNAN joins and with whom JUSTICE O'CONNOR joins as to Parts I, II, IV, and V, dissenting.

Section 504 of the Rehabilitation Act of 1973 forbids discrimination solely on the basis of handicap in programs or activities receiving federal financial assistance. The issue before us is whether the Secretary of Health and Human Services has any authority under the Act to regulate medical treatment decisions concerning handicapped newborn infants. Relying on its prior decision in *United States* v. *University Hospital*, 729 F. 2d 144 (CA2 1984), the Court of Appeals held that the Secretary was without power in this respect and affirmed a decision of the District Court that § 504 does not extend so far and that the Secretary may not regulate such decisions in any manner.

Although it is my view that we granted certiorari to address this issue, the plurality avoids it by first erroneously reading the decision below as enjoining only the enforcement of specific regulations and by then affirming on the basis that the promulgation of the regulations did not satisfy established principles of administrative law, a matter that the Court of Appeals had no occasion to, and did not, discuss. With all due respect, I dissent.

I

The plurality's initial and fundamental error is its statement that the only question presented here is the specific question whether the four mandatory provisions of the Final Rules issued by the Secretary are authorized by § 504. This conclusion misconstrues the opinion and judgment of the Court of Appeals. The plurality concedes that the District Court's judgment on its face did not stop with enjoining the

enforcement of the final regulations. *Ante*, at 625–626, n. 11. In fact, the District Court permanently enjoined the Secretary from implementing the final regulations and also from "continuing or undertaking any other actions to investigate or regulate treatment decisions involving impaired newborn infants taken under authority of Section 504, including pending investigation and other enforcement actions." App. to Pet. for Cert. 51a–52a. This broad injunction ousted the Secretary from the field entirely and granted the precise relief sought by the complaint, which was filed after *University Hospital* and which sought to take full advantage of that decision.[1] The Court of Appeals affirmed and in no way modified the injunction that the District Court had entered. In doing so, the Court of Appeals relied on its previous determination in *University Hospital* that the Secretary had no statutory authority to regulate medical treatment decisions regarding newborn infants. See App. to Pet. for Cert. 2a–3a.[2]

---

[1] I disagree with the plurality's conclusion that "[t]he complaints in this case did not challenge the Department's authority to regulate all treatment decisions, but more precisely the mandatory provisions of the Final Rules and enforcement activity along those lines but undertaken pursuant to the Department's 'general authority' to enforce § 504." *Ante*, at 625, n. 11. Although focusing most extensively on the regulations and pending HHS investigations, the complaint specifically cited the *University Hospital* holding that "Section 504 [does] not apply to 'treatment decisions involving defective newborn infants.'" App. 138. The complaint also specifically requested that the District Court "issue a preliminary and permanent injunction prohibiting the defendant from enforcing her final rule embodied in 45 CFR § 84.55, 49 Fed. Reg. 1622, *et seq.* (Jan. 12, 1984), and prohibiting defendant from otherwise acting pursuant to the claimed authority of Section 504 of the Rehabilitation Act of 1973 in regard to the medical treatment of infants with birth defects." *Id.*, at 159. The complaint thus requested both invalidation of the regulations and an injunction against all other actions by the Secretary in this area.

[2] The Court of Appeals' brief order affirming the District Court's judgment, although characterizing that judgment generally as having struck down the regulations, cited *University Hospital* and made no changes in the broad relief awarded by the District Court. The Court of Appeals

It is true that the regulations themselves were invalidated and their enforcement enjoined. This result, however, was directly compelled by the *University Hospital* conclusion that the Secretary was without power to issue any regulations whatsoever that dealt with infants' medical care, and it did not comprise the whole relief awarded by the District Court and affirmed by the Court of Appeals. I thus see no justification for the plurality's distortion of the Court of Appeals' affirmance of the District Court's all-inclusive injunction, which, like *University Hospital*, now represents the law in the Second Circuit.[3] We should resolve the threshold statutory question that this case and *University Hospital* clearly pose—namely, whether the Secretary has any authority at all under the Act to regulate medical care decisions with respect to the handicapped newborn.[4]

## II

Section 504 of the Act, which was construed in *University Hospital*, provides:

"No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title,

gave absolutely no indication that it was construing the District Court's judgment one whit less broadly than that judgment's language indicated. Nowhere, therefore, is there a justification for the plurality's reconstructive reading of the Court of Appeals' judgment.

[3] I note in this regard that the parties as well do not appear to have contemplated the more limited reading of the judgment below adopted by the plurality. See Brief for Petitioner 9; Brief for Respondents American Hospital Association et al. 4; Brief for Respondents American Medical Association et al. 14.

[4] I would not avoid the issue of the validity of *University Hospital* even if the judgment below were limited to invalidation of these regulations. Given that the judgment below, whether it extends as far as *University Hospital* or not, was based on the *University Hospital* view that *all* regulation of medical treatment decisions is outside the Secretary's § 504 authority because of the nature of those decisions, I believe that the better approach here would be for the Court to determine the correctness of *University Hospital* in any case.

shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U. S. C. § 794.

After determining that § 706(7), which defines handicapped persons, is not limited to adults and includes the newborn, the Court of Appeals in *University Hospital* construed the "otherwise qualified" language of § 504 to limit the reach of the section to situations in which the handicap is "unrelated to, and thus improper to consideration of, the services in question." 729 F. 2d, at 156.[5] This, concluded the Court of Appeals, would exclude most handicapped newborns because their handicaps are not normally irrelevant to the need for medical services. Furthermore, the Court of Appeals thought that the "otherwise qualified" limitation should not be applied in the "comparatively fluid context of medical treatment decisions" because "[w]here the handicapping condition is related to the condition(s) to be treated, it will

[5] The Court of Appeals first addressed and reserved the question whether the hospital or its functions comprised a program or activity receiving federal financial assistance. Noting that this was a fact-specific inquiry, cf. *Grove City College* v. *Bell,* 465 U. S. 555 (1984), the Court of Appeals assumed that the entire hospital was covered by § 504 and proceeded to consider "whether, assuming the entire hospital is covered by section 504, the statute authorizes the type of investigation initiated here." 729 F. 2d, at 151.

I also do not consider whether or under what circumstances hospitals or hospital neonatal programs may constitute programs or activities receiving federal financial assistance. The judgment of the District Court which was affirmed by the Court of Appeals does not set forth guidelines for interpreting this language in this context: It merely enjoins actions directed at such programs or activities. The regulations as well simply adopt the statutory language without interpreting it. Thus, I assume here that the § 504 strictures would be applied only to appropriate programs or activities, and I therefore would leave discussion of this fact-specific issue for further proceedings. I would not now hold that § 504 may never apply on this basis.

rarely, if ever, be possible to say with certainty that a particular decision was 'discriminatory.'" *Id.*, at 156–157.

Having identified these perceived incongruities between the language of § 504 and the potential regulation of medical decisions regarding handicapped newborns, the Court of Appeals concluded that "[b]efore ruling that congress intended to spawn this type of litigation under section 504, we would want more proof than is apparent from the face of the statute." *Id.*, at 157. Thus, the Court of Appeals turned to the legislative history, where it again found nothing to persuade it that Congress intended § 504 to apply to medical treatment of handicapped infants and hence to enter a field so traditionally occupied by the States. Neither did it consider the current administrative interpretation of § 504 to be a longstanding agency construction calling for judicial deference. In the Court of Appeals' view, therefore, the section was inapplicable to medical treatment decisions regarding the newborn absent some further indication of congressional intent.

I disagree with this conclusion, which the Court of Appeals adhered to in the case before us now. Looking first at the language of the statute, I agree with the Court of Appeals' preliminary conclusion that handicapped newborns are handicapped individuals covered by the Act. There is no reason for importing an age limitation into the statutory definition, and this Court has previously stated that "§ 504 protects handicapped persons of all ages from discrimination in a variety of programs and activities receiving federal financial assistance." *Smith* v. *Robinson*, 468 U. S. 992, 1016–1017 (1984).[6] This leaves the critical question whether a handi-

---

[6] Although infants with birth defects are clearly handicapped individuals covered by § 504, there is one manner in which they may differ from most other handicapped individuals for § 504 purposes. Specifically, they may have a combination of conditions—some of which are medically correctable and some of which are not. In older handicapped individuals, medically correctable conditions may have been corrected so that only irreparable handicapping conditions remain. In a newborn infant, however, both correctable and incorrectable conditions may exist. Thus, since both of these

capped infant can ever be "otherwise qualified" for medical treatment and hence possibly subjected to unlawful discrimination when he or she is denied such treatment.[7]

<hr>

may interfere with major life activities, both types of conditions may be considered to be handicaps.   In this context, however, it might make more sense to consider as handicaps only those conditions that cannot be medically treated to the point that they will not impair major life activities. For such correctable conditions would not be likely to cause the infant to be regarded as handicapped.   In any case, I believe that defining an infant's handicap may well be a delicate problem and one that deserves some consideration.

[7] It would appear that for an infant to be qualified for treatment his or her parents must have consented to such treatment.   For the purposes of this discussion of whether the Court of Appeals was correct that medical treatment decisions may *never* be regulated by § 504, I assume that parental consent has been given and that the arguably discriminatory treatment decision is being made by the hospital or doctor.   The Court of Appeals in *University Hospital* concentrated on the nature of these decisions in concluding that § 504 may not properly be applied, and I concentrate on that as well.   That a situation in which treatment is refused where parental consent has been given may not have been shown to have arisen does not undermine this assumption here.   The critical question is whether the operative provisions of § 504 may *ever* apply here given the nature of the decision.

For the purposes of addressing the Court of Appeals' *University Hospital* analysis, the most straightforward fact situation to consider is one in which the benefit provided is the medical treatment itself and in which a hospital refuses treatment in the face of parental consent.   In this context, the Court of Appeals' conclusion that the nature of the decisions themselves precludes application of § 504 may be addressed with maximum simplicity.   I note, however, that it may well be that the benefits provided by hospitals and doctors and covered by § 504 extend beyond treatment itself. For example, one benefit provided by hospitals and doctors to patients who cannot make their own medical treatment decisions may be medical advice in those patients' best interest to those who must ultimately make the relevant medical treatment decisions.   To the extent that the provision of this benefit is a program or activity covered by the statute, I would think that the statute requires that the same advice be given to parents of a handicapped baby as to the parents of a similarly situated nonhandicapped baby. Another benefit provided may be the reporting of nontreatment to the relevant state agency in the case of a parental decision not to treat.   Again,

It may well be that our prior consideration of this language has implied that the Court of Appeals' construction is correct. In *Southeastern Community College* v. *Davis*, 442 U. S. 397, 406 (1979), we held that "[a]n otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap." This formulation may be read as implying that where a handicapped person meets all of the requirements normally necessary to receive a program's benefits regardless of his or her handicap, he or she is otherwise qualified because that handicap does not interfere with and is thus irrelevant to his or her qualification for the program. Thus, the Court of Appeals' view—that refusing treatment that is called for only because of the handicapping condition cannot constitute discrimination on the basis of handicap since there will be no similarly situated nonhandicapped newborn, *i. e.*, one who needs the same treatment—draws support from our holding in *Davis* since it turns on the same underlying perception that discrimination occurs only when the handicapping condition is irrelevant to the qualification for the program.

---

to the extent that the provision of this benefit is a program or activity covered by the statute, see n. 13, *infra*, I would think that § 504 requires that the hospital or doctor report nontreatment of a handicapped baby when it would report the denial of the same treatment for a nonhandicapped baby.

My conclusions in this regard are buttressed by my view of § 504's coverage in the case of a medical treatment decision regarding a black baby. If a hospital or doctor advised different or less efficacious treatment for a black baby than for a white baby, I believe that this would be discrimination under the statute. Similarly, a failure to report a parental decision not to treat because of race would seem to me to be illegally discriminatory—assuming that this decision otherwise came within the statute.

In sum, although these additional situations present the same issue as to when a handicapped baby is otherwise qualified and when such a baby is subjected to discrimination as does the direct example of a refusal to treat and although it may well be that it would be in these contexts that the statute would most likely be given effect, for simplicity's sake I have centered my discussion of *University Hospital* on the refusal-to-treat example.

Even under the Court of Appeals' interpretation of "otherwise qualified," however, it does not follow that § 504 may never apply to medical treatment decisions for the newborn. An esophageal obstruction, for example, would not be part and parcel of the handicap of a baby suffering from Down's syndrome, and the infant would benefit from and is thus otherwise qualified for having the obstruction removed in spite of the handicap. In this case, the treatment is completely unrelated to the baby's handicapping condition. If an otherwise normal child would be given the identical treatment, so should the handicapped child if discrimination on the basis of the handicap is to be avoided.[8]

It would not be difficult to multiply examples like this. And even if it is true that in the great majority of cases the handicap itself will constitute the need for treatment, I doubt that this consideration or any other mentioned by the Court of Appeals justifies the wholesale conclusion that § 504 never applies to newborn infants with handicaps. That some or most failures to treat may not fall within § 504, that discerning which failures to treat are discriminatory may be difficult, and that applying § 504 in this area may intrude into the traditional functions of the State do not support the categori-

---

[8] There are substantial arguments that could be made that the Court of Appeals too narrowly read the statute. It could be argued, for example, that the benefit provided by hospitals is not defined in terms of specific treatments. Rather, the benefit is "general medical care for whatever happens to need treating." If this is the benefit, then a much broader application of the statute in this context is reasonable. Alternatively, even if the benefit is defined more narrowly, "reasonable accommodation" might require more than mere impartial dispensing of identical treatment. See *Alexander* v. *Choate*, 469 U. S. 287, 299–300, and nn. 19, 20 (1985). I need not resolve this issue of the exact meaning of § 504 and *Davis* in this context, however, because my conclusion that *University Hospital*'s broad reasoning was incorrect does not depend on it. Although I do not resolve these issues, I note that while the more expansive interpretations seem consistent with the interpretation adopted by the Secretary in the regulations, the more restrictive one does not. See 45 CFR pt. 84, Appendix C, ¶ (a) (1985).

cal conclusion that the section may never be applied to medical decisions about handicapped infants. And surely the absence in the legislative history of any consideration of handicapped newborns does not itself narrow the reach of the statutory language. See *Jefferson County Pharmaceutical Assn.* v. *Abbott Laboratories*, 460 U. S. 150, 159–162, and n. 18 (1983). Furthermore, the broad remedial purpose of the section would be undermined by excluding handicapped infants from its coverage; and if, as the plurality indicates, *ante*, at 642–643, the Secretary has substantial leeway to explore areas in which discrimination against the handicapped poses serious problems and to devise regulations to prohibit the discrimination, it is appropriate to take note of the Secretary's present view that § 504 properly extends to the subject matter at issue here. Thus, I believe that the Court of Appeals in *University Hospital* incorrectly concluded that § 504 may never apply to medical treatment decisions concerning handicapped newborn infants. Where a decision regarding medical treatment for a handicapped newborn properly falls within the statutory provision, it should be subject to the constraints set forth in § 504. Consequently, I would reverse the judgment below.

## III

Having determined that the stated basis for the Court of Appeals' holding in *University Hospital* was incorrect and that the decision below cannot be supported by *University Hospital*'s blanket prohibition, I would remand the case to the Court of Appeals. Respondents have, as the plurality's opinion itself demonstrates, raised significant issues aside from the threshold statutory issue presented here. There are, for example, substantial questions regarding the scope of the Secretary's statutory authority in this area and whether these particular regulations are consistent with the statute. I would decline to reach and decide these questions for the first time in this Court without the benefit of the

lower courts' deliberations.[9]  The plurality, however, has chosen to reach out and address one of those subsidiary issues.  Because the plurality has resolved that issue in a manner that I find indefensible on its own terms, I too address it.

The plurality concludes that the four mandatory provisions of the final regulations are invalid because there is no "'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Assn., Inc.* v. *State Farm Mutual Automobile Ins. Co.*, 463 U. S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc.* v. *United States,* 371 U. S. 156, 168 (1962)).  The basis for this conclusion is the plurality's perception that two and only two wholly discrete categories of decisions are the object of the final regulations: (1) decisions made by hospitals to treat or not treat where parental consent has been given and (2) decisions made by hospitals to refer or not to refer a case to the state child protective services agency where parental consent has been withheld.[10]

---

[9] In addition, although the Secretary did not brief the merits of respondents' claim that the regulations are invalid because arbitrary and capricious, the Secretary did indicate his view that this claim in its current form is not properly in the case and that it is inadequate on its face.  See Reply Brief for Petitioner 16, n. 6.

Specifically, the Secretary first asserts that respondents' argument as to the lack of factual basis involving situations in which parents *have* consented to treatment was not raised in the complaint.  See App. 146 (challenging lack of showing of instances where "erroneous" parental decisions were made and where medical authorities did not take proper measures under state law).  Thus, the Secretary contends that the first major claim addressed and relied on by the plurality was never properly raised.  Second, the Secretary contends that these are interpretative regulations that impose no new substantive duties, see 49 Fed. Reg. 1628 (1984), and that no factual basis for their issuance need therefore be given.  Cf. 5 U. S. C. § 553(b).

These contentions, although not perhaps representing a procedural bar to our reaching this claim, see *ante,* at 629, n. 14, do provide an additional sign that the plurality's resolution of this case rests on shaky ground.

[10] At this point in the case, as the plurality observes, all parties concerned agree that parental decisions are not included in § 504's application.  See *ante,* at 630.

Since the Secretary has not specifically pointed to discriminatory actions that provably resulted from either of these two specific types of decisions, the plurality finds that the Secretary's conclusion that discrimination is occurring is unsupported factually. The plurality's characterization of the Secretary's rationale, however, oversimplifies both the complexity of the situations to which the regulations are addressed and the reasoning of the Secretary.

First, the Secretary's proof that treatment is in fact being withheld from handicapped infants is unquestioned by the plurality. It is therefore obvious that whoever is making them, *decisions* to withhold treatment from such infants are in fact being made. This basic understanding is critical to the Secretary's further reasoning, and the discussion accompanying the proposed regulations clearly indicates that this was the Secretary's starting point. See 48 Fed. Reg. 30847–30848 (1983). Proceeding with this factual understanding, the next question is whether such withholding of treatment constitutes prohibited discrimination under § 504 in some or all situations. It is at this point that the plurality errs. In the plurality's view, only two narrow paradigmatic types of decisions were contemplated by the Secretary as potentially constituting discrimination in violation of the statute. See *ante*, at 628–629. The plurality does not explain, however, precisely what in the Secretary's discussion gives rise to this distillation, and my reading of the explanation accompanying the regulations does not leave me with so limited a view of the Secretary's concerns.

The studies cited by the Secretary in support of the regulations and other literature concerning medical treatment in this area generally portray a decisionmaking process in which the parents and the doctors and often other concerned persons as well are involved—although the parental decision to consent or not is obviously the critical one.[11] Thus, the pa-

---

[11] See, *e. g.,* Duff & Campbell, Moral and Ethical Dilemmas in the Special-Care Nursery, 289 N. Eng. J. Med. 890 (1973). See also Gross,

rental consent decision does not occur in a vacuum. In fact, the doctors (directly) and the hospital (indirectly) in most cases participate in the formulation of the final parental decision and in many cases substantially influence that decision.[12] Consequently, discrimination against a handicapped infant may assume guises other than the outright refusal to treat once parental consent has been given. Discrimination may occur when a doctor encourages or fails to discourage a parental decision to refuse consent to treatment for a handicapped child when the doctor would discourage or actually oppose a parental decision to refuse consent to the same treatment for a nonhandicapped child. Or discrimination may occur when a doctor makes a discriminatory treatment recommendation that the parents simply follow. Alternatively, discrimination may result from a hospital's explicit laissez-faire attitude about this type of discrimination on the part of doctors.

Contrary to the plurality's constrained view of the Secretary's justification for the regulations, the stated basis for those regulations reveals that the Secretary was cognizant of this more elusive discrimination. For example, the evidence cited most extensively by the Secretary in his initial proposal of these regulations was a study of attitudes of practicing and teaching pediatricians and pediatric surgeons. See 48 Fed. Reg. 30848 (1983) (citing Shaw, Randolph, & Manard, Ethical Issues in Pediatric Surgery: A National Survey of Pediatricians and Pediatric Surgeons, 60 Pediatrics 588 (1977)). This study indicated that a substantial number of these doctors (76.8% of pediatric surgeons and 49.5% of pedi-

---

Cox, Tatyrek, Pollay, & Barnes, Early Management and Decision Making for the Treatment of Myelomeningocele, 72 Pediatrics 450 (1983).

[12] Presumably, the program or activity that § 504 would apply to in this context would be the hospital's neonatal program of medical care or the hospital's program of medical care generally. In either case, actions of both doctors and hospitals that cause or permit discriminatory decisions that are taken as part of the program or activity would be subject to § 504's constraints.

atricians) would "acquiesce in parents' decision to refuse consent for surgery in a newborn with intestinal atresia if the infant also had . . . Down's syndrome." *Id.*, at 590. It also indicated that a substantial minority (23.6% of pediatric surgeons and 13.2% of pediatricians) would in fact encourage parents to refuse consent to surgery in this situation and that only a small minority (3.4% of pediatric surgeons and 15.8% of pediatricians) would attempt to get a court order mandating surgery if the parents refused consent. In comparison, only a small minority (7.9% of pediatric surgeons and 2.6% of pediatricians) would acquiesce in parental refusal to treat intestinal atresia in an infant with no other anomaly. And a large majority (78.3% of pediatric surgeons and 88.4% of pediatricians) would try to get a court order directing surgery if parental consent were withheld for treatment of a treatable malignant tumor. The Secretary thus recognized that there was evidence that doctors would act differently in terms of attempts to affect or override parental decisions depending on whether the infant was handicapped.

Based on this evidence, the Secretary conceded that "[t]he full extent of discriminatory and life-threatening practices toward handicapped infants is not yet known" but concluded "that for even a single infant to die due to lack of an adequate notice and complaint procedure is unacceptable." 48 Fed. Reg. 30847 (1983). Thus, the Secretary promulgated the regulations at issue here. These regulations, in relevant part, require that a notice of the federal policies against discrimination on the basis of handicap be posted in a place where a hospital's health care professionals will see it. This requirement is, as the Secretary concluded, "[c]onsistent with the Department's intent to target the notice to nurses and other health care professionals." App. 25. The notice requirement, therefore, may reasonably be read as aimed at fostering an awareness by health care professionals of their responsibility not to act in a discriminatory manner with respect to medical treatment decisions for handicapped infants.

The second requirement of the regulations, that state agencies provide mechanisms for requiring and reporting medical neglect of handicapped children, is also consistent with the Secretary's focus on discrimination in the form of discriminatory reporting.[13]

I therefore perceive a rational connection between the facts found by the Secretary and the regulatory choice made. The Secretary identified an existing practice that there was reason to believe resulted from discrimination on the basis of handicap. Given this finding, the amorphous nature of much of the possible discrimination, the Secretary's profession that the regulations are appropriate no matter how limited the problem,[14] and the focus of the regulations on loci where unlawful discrimination seems most likely to occur and on persons likely to be responsible for it, I conclude that these regulations are not arbitrary and capricious and that the Court errs in striking them down on that basis. Although the Secretary's path here may be marked with "'less than ideal clarity,'" we will uphold such a decision "'if the agency's path may reasonably be discerned.'" *Motor Vehicles Mfrs. Assn.*, 463 U. S., at 43 (quoting *Bowman Transportation, Inc.* v. *Arkansas-Best Freight System, Inc.*, 419 U. S. 281, 286 (1974)).

The plurality also objects to the regulations' requirement concerning the state protective agencies' reporting proce-

---

[13] The plurality reserves the question whether reporting would be a program or activity receiving federal financial assistance, *ante*, at 639, n. 25, and I follow that course.

[14] The plurality itself says that "regulations may be imposed for preventative or prophylactic reasons," *ante*, at 643, but concludes that the Secretary here proceeded based on the perception of an actual problem rather than a need for prophylactic rules. To me, however, the Secretary's statement that the rules are appropriate if necessary for even one problem situation makes the plurality's distinction in this respect questionable: The line between a prophylactic rule and a rule that draws its justification from the likely existence of even one unlawful action seems to me a very fine one.

dures on another ground. Specifically, the plurality finds that this requirement is in fact a substantive prescription rather than a prohibition of discrimination. The plurality bases this conclusion on the fact that the regulation sets forth specific procedures that must be adopted by state agencies.

The plurality's conclusion disregards the Secretary's explanation for this requirement. In the preamble to the proposed regulations, the Secretary explicitly stated:

> "The Department has determined that under every state's law, failure of parents to provide necessary, medically indicated care to a child is either explicitly cited as grounds for action by the state to compel treatment or is implicitly covered by the state statute. These state statutes also provide for appropriate administrative and judicial enforcement authorities to prevent such instances of medical neglect, including requirements that medical personnel report suspected cases to the state child protective services agency, agency access to medical files, immediate investigations and authority to compel treatment." 48 Fed. Reg. 30848 (1983).

This finding was repeated in the statement accompanying the final regulations:

> "Although there are some variations among state child protective statutes, all have the following basic elements: a requirement that health care providers report suspected cases of child abuse or neglect, including medical neglect; a mechanism for timely receipt of such reports; a process for administrative inquiry and investigation to determine the facts; and the authority and responsibility to seek an appropriate court order to remedy the apparent abuse and neglect, if it is found to exist." 49 Fed. Reg. 1627 (1984).

The regulations, in turn, require that the State provide these same services with respect to medical neglect of handicapped infants. See 45 CFR § 84.55(c) (1985). The only

additional requirements imposed by the regulations involve provisions enabling the Department itself to review for compliance with the nondiscrimination requirements. Consequently, the regulations simply track the existing state procedures found to exist by the Secretary, requiring that funded state agencies provide those same procedures for handicapped children. The fact that the regulations specify the procedures that are necessary to ensure an absence of discrimination and do not instead speak in "nondiscrimination" terms is irrelevant. The substance of the requirement is nondiscrimination. The plurality's conclusion in this regard, however, apparently rests on a determination that implementation of a nondiscrimination mandate may be accomplished in only one form—even if the same result may be accomplished by another route. See *ante*, at 640, n. 26. I would not elevate regulatory form over statutory substance in this manner. In sum, the plurality's determination that the regulations were inadequately supported and explained as a matter of administrative law does not withstand examination of the Secretary's discussion of the underlying problem and of the contours of the regulations themselves.

## IV

My disagreement with the plurality in this case does not end here, however. For even under its chosen rationale, I find its ultimate conclusion dubious. Having assiduously restricted its discussion to the validity of the regulations only, the plurality ends up concluding expansively that not only the regulations but also other investigations taken by the Secretary independent of the regulations are invalid. Thus, the Court apparently enjoins the Secretary's on-site investigations as well as "the regulations which purport to authorize a continuation of them." *Ante*, at 647. And the plurality rests this action on the conclusion that the lower courts "correctly held that these investigative actions were not authorized by the statute." *Ibid.*

I am at a loss to understand the plurality's reasoning in this respect. In construing the judgment below, the plurality appears to conclude that, although the injunction entered by the District Court and affirmed by the Court of Appeals did not purport to prohibit *all* actions by the Secretary under the statute, the injunction did in fact extend beyond merely these particular regulations. Thus, the plurality indicates that the judgment below applied as well to actions that "resemble," "parallel," or are "along [the] lines [of]" the regulations. *Ante*, at 625–626, n. 11. The plurality further defines what actions it believes the Court of Appeals and District Court contemplated: "[T]he injunction forbids continuation or initiation of regulatory and investigative activity directed at instances in which parents have refused consent to treatment and, if the Secretary were to undertake such action, efforts to seek compliance with affirmative requirements imposed on state child protective services agencies." *Ante*, at 625, n. 11.

Aside from the fact that I see absolutely nothing in either the District Court's or the Court of Appeals' judgment that would support a constrained reading of the broadly phrased relief awarded by the District Court and affirmed without modification by the Court of Appeals,[15] I have some doubt as to how different the Court's holding today is from a holding that § 504 gives HHS no authority whatsoever over decisions to treat handicapped infants. The plurality's lack of coherence on this crucial point raises substantial doubts as to the reach of the holding and as to the basis for that holding.

Finally, I am puzzled as to how and why the plurality's determination that the regulations are invalid because they are arbitrary and capricious extends to other actions not taken under the regulations. The plurality apparently would enjoin all enforcement actions by the Secretary in situations in which parents have refused to consent to treatment. See *ante*, at 625–626, n. 11. Yet it is not clear to me that the

---

[15] See nn. 1–2, *supra*, and accompanying text.

plurality's basis for invalidating these regulations would extend to all such situations. I do not see, for example, why the plurality's finding that the Secretary did not adequately support his conclusion that failures to report refusals to treat likely result from discrimination means that such a conclusion will *never* be justified. The Secretary might be able to prove that a particular hospital generally fails to report nontreatment of handicapped babies for a specific treatment where it reports nontreatment of nonhandicapped babies for the same treatment. In essence, a determination that these regulations were inadequately supported factually would not seem to be properly extended beyond actions taken pursuant to these regulations: The fact that the Secretary has not adequately justified generalized action under the regulations should not mean that individualized action in appropriate circumstances is precluded.

## V

In sum, the plurality today mischaracterizes the judgment below and, based on that mischaracterization, is sidetracked from the straightforward issue of statutory construction that this case presents. The plurality incorrectly resolves an issue that was not fully addressed by the parties, gives no guidance to the Secretary or the other parties as to the proper construction of the governing statute, and fails adequately to explain the precise scope of the holding or how that holding is supported under the plurality's chosen rationale. From this misguided effort, I dissent.

JUSTICE O'CONNOR, dissenting.

I fully agree with JUSTICE WHITE's conclusion that the only question properly before us is whether the Court of Appeals correctly concluded that the Secretary has no power under 29 U. S. C. § 794 to regulate medical treatment decisions concerning handicapped newborn infants. I also agree that application of established principles of statutory construction and of the appropriate standard for judicial review

of agency action leads inescapably to the conclusion that the Secretary has the authority to regulate in this area. Because, however, I see no need at this juncture to address the details of the regulations or to assess whether they are sufficiently rational to survive review under 5 U. S. C. § 706 (2)(A), I join only parts I, II, IV, and V of JUSTICE WHITE's dissent.